# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

**Du Daobin, Zhou Yuanzhi, Liu Xianbin,**  :
**and Does 1-10**,                         :
                                           :
      Plaintiffs            :
                                           :
v.                                         :
                                           :
**CISCO Systems, Inc.**                    :
170 West Tasman Drive                      :
San Jose, CA 95134                         :
                                           :
**Thomas Lam**                             :
President of China Operations              :
CISCO Systems, Inc                         :
170 West Tasman Drive                      :
San Jose, CA 95134                         :
                                           :
**Owen Chan**                              :
President of Asia Pacific Operations       :
CISCO Systems, Inc.                        :
170 West Tasman Drive                      :
San Jose, CA 95134                         :
                                           :
**Rick Justice**                           :
Executive Advisor                          :
Office of the Chairman and CEO             :
CISCO Systems, Inc.                        :
170 West Tasman Drive                      :
San Jose, CA 95134                         :
                                           :
**John T. Chambers**                       :
Chairman and CEO                           :
CISCO Systems, Inc.                        :
170 West Tasman Drive                      :
San Jose, CA 95134                         :
Defendants.                                :

1

# COMPLAINT

Plaintiffs, by and through their attorneys, allege upon personal knowledge and belief as to their own circumstances, and upon information and belief (based on the investigation of counsel) as to all other matters, that substantial evidentiary support exists or will exist after a reasonable opportunity for further investigation and discovery as a result of trial proceedings, in support of the following:

1. Named Plaintiffs and additional unnamed and to be identified Plaintiffs (hereinafter referred to collectively as "Plaintiffs") have been and are being subjected to grave violations of some of the most universally recognized standards of international law, including prohibitions against torture, cruel, inhuman, or other degrading treatment or punishment, arbitrary arrest and prolonged detention, and forced labor, for exercising their rights of freedom of speech, association, and assembly, at the hands of Defendants through Chinese officials acting under color of law in the People's Republic of China (referred to herein as "the PRC" or "China").

2. To commit these violations of specific, universal, and obligatory standards of international law, Defendants willingly and knowingly provided Chinese officials with technology and training to access private internet communications, identify anonymous web log ("blog") authors, prevent the broadcast and dissemination of peaceful speech, and otherwise aid and abet in the violation of Plaintiffs' fundamental human rights.

3. Defendants committed these acts knowingly and with actual knowledge of the consequences of their profit-seeking actions. Defendants' own written and spoken statements make clear that Defendants sought to profit from PRC's "Golden Shield" project as much as possible, and Defendants, while fully cognizant of the grave violations of universally recognized

standards of international law that would result from the "Golden Shield" project, chose to aid and abet PRC in its efforts to create, maintain, and expand the Golden Shield and did indeed profit substantially as a result.

4.    Defendants' knowing and willful actions, in providing substantial aid, assistance, and encouragement to the PRC in the creation, maintenance and expansion of the Golden Shield, served and are continuing to serve as the basis for the acts of persecution and torture that occurred and are occurring as a direct result of Defendants' activities.  In so acting, Defendants knowingly and willfully aided and abetted in the commission of torture, cruel, inhuman, or other degrading treatment or punishment, arbitrary arrest and prolonged detention, forced labor and other major abuses violating international law that caused Plaintiffs severe physical and mental pain and suffering.

5.    Plaintiffs' claims are actionable under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, because their injuries resulted from violations of specific, universal, and obligatory standards of international law as embodied in a number of treaty obligations binding on the United States and implemented domestically here in the United States by a number of statutes including the TVPA.

6.    Defendants' conduct also violates Maryland state laws, including prohibitions against battery, false imprisonment, assault, intentional infliction of emotional distress, and/or negligence.

7.    Defendants' conduct also breaches United States law under the Electronic Communications Privacy Act by exceeding their authorization to access and control highly private and potentially damaging information concerning Plaintiffs' electronic communications, in violation of 18 U.S.C. § 2701, by unlawfully and knowingly divulging Plaintiffs' electronic

communication contents and user information, in violation of 18 U.S.C. § 2702, and by intentionally acquiring and/or intercepting the contents of electronic communications sent by and/or received by Plaintiffs through their use of computers, routing equipment and other electronic devices which were part of, and utilized in, Defendants' electronic communications systems, in violation of 18 U.S.C. § 2511.

8.    Defendants' conduct also breaches United States law in that Defendants' actions are in direct violation of the "Tiananmen Square sanctions"[1] which included a suspension of export licenses for crime control and detection instruments and equipment.

9.    Plaintiffs seek general, compensatory, and punitive damages for their injuries, as well as declaratory and injunctive relief to hold Defendants accountable for their unlawful actions, and to secure Defendants' assistance in obtaining the Plaintiffs' release from prison. Plaintiffs also seek relief that would prevent Defendants from similarly harming others in the future.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1350 (Alien Tort Statute), 28 U.S.C. § 1350 (Torture Victim Protection Act) and 18 U.S.C. § 2701 *et seq*. (The Electronic Communications Privacy Act). The Alien Tort Statute provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The Torture Victim Protection Act supplements and confirms the ATS by providing federal court jurisdiction for acts of torture, as defined by 28 U.S.C. § 1350. The Electronic Communications Privacy Act, 18

---

[1] See Sec. 902 of the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991 (P.L. 101-246; 22 U.S.C. 2151 note).

U.S.C. § 2701 *et seq.*, provides federal jurisdiction for civil claims arising from unauthorized disclosure of electronic communications and customer information.

11.     This Court also has supplemental jurisdiction over claims arising from violations of state law because, pursuant to 28 U.S.C. § 1367, the facts in the claims arising from state law are so related to the Plaintiffs' claims under federal laws that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue in this District is proper because Defendant CISCO Systems, Inc. ("CISCO") maintains a permanent office in this District, does business in this District, and has substantial and ongoing business contacts in this District, including with certain Federal Government clients that are located in this District.  The individual (non-corporate) Defendants are similarly subject to the jurisdiction of this court by virtue of their corporate ties with CISCO and/or business contacts and activities in this jurisdiction.

## PARTIES

### *Plaintiffs*

13.     Plaintiff **Du Daobin** ("Du") is a subject, citizen, and resident of the People's Republic of China.  He sues on behalf of himself for the injuries, including severe pain and suffering, he has endured as a result of his torture, cruel, inhuman, or other degrading treatment, and arbitrary arrest and prolonged detention inflicted upon him as a result of Defendants' actions aiding and abetting Chinese government officials in committing these major human rights abuses. Specifically, **Du Daobin** was arrested, unlawfully detained, and prosecuted for publishing and circulating internet articles calling for fair treatment of rural farmers in addition to strong criticisms of the Chinese Communist Party ("CCP"). He also sues for compensation for property seized by government officials in conjunction with his unlawful and prolonged

detention. Previously a victim to unlawful detention, torture, and house arrest, Du remains closely monitored and restricted to Yingcheng City. As a result of Du's harassment, his wife has moved out and left him to raise their child.

14.    Plaintiff **Zhou Yuanzhi** ("Zhou") is a subject, citizen, and resident of the People's Republic of China. He sues on behalf of himself for the injuries, including severe pain and suffering, he has endured as a result of his torture, cruel, inhuman, or other degrading treatment, and arbitrary arrest and prolonged detention inflicted upon him as a result of Defendants' actions aiding and abetting Chinese government officials in committing these major human rights abuses. Specifically, **Zhou Yuanzhi** was arrested, unlawfully detained, and prosecuted for publishing and circulating internet articles that support human rights and democratic reform in China, as well as serving as a reporter for the Laogai Research Foundation ("LRF"). He also sues for compensation for property seized by government officials in conjunction with his unlawful and prolonged detention. Previously a victim to unlawful detention, torture, and house arrest, Zhou is currently a prisoner in his own home while his family bears the significant consequences of his political discrimination.

15.    Plaintiff **Liu Xianbin** ("Liu") is a subject, citizen, and resident of the People's Republic of China. His wife Chen Ming Xian so authorized this suit on behalf of her husband, Liu Xianbin, for the injuries, including severe pain and suffering, he has endured as a result of his torture, cruel, inhuman, or other degrading treatment, and arbitrary arrest and prolonged detention inflicted upon him as a result of Defendants' actions aiding and abetting Chinese government officials in committing these major human rights abuses. Specifically, **Liu Xianbin** was arrested, unlawfully detained, and prosecuted for publishing and circulating internet articles that support human rights and democratic reform in China, as well as communicating with other

6

Chinese reform advocates. He also sues for compensation for property seized by government officials in conjunction with his unlawful and prolonged detention. He is currently serving a ten-year sentence in the Chuanzhong Prison. He was sentenced on March 25, 2011 for "inciting subversion of state power." He has currently served over two months of his ten-year sentence.

16.    Additional Plaintiffs temporarily designated as "**Does 1-10**" are citizens of China currently living in China or in exile in other countries, such as the United States, who were arbitrarily detained, arrested, tortured, subjected to cruel, inhuman, or degrading treatment or punishment, and/or subjected to forced labor, as a result of Defendants' actions in aiding and abetting these violations of United States and international law, including federal and state laws that provide civil actions for Defendants' acts. At the time of filing, Plaintiffs have identified hundreds of individuals arbitrarily imprisoned in China for expressing their support for free elections, democracy, or human rights through internet communications or use and whose arrests and detention are directly linked to Defendants' knowingly aiding and abetting the PRC's unlawful acts. Additional information about their arrests and detention, and their treatment in detention, for these unnamed individuals, as well as information about how Defendants may be responsible for their abuse, will be obtained during discovery and described in greater detail during these proceedings. Their inclusion in this lawsuit is critical both in order to identify the extent of Defendants' role in enabling these abuses, as well as to curb, prevent and remedy current corporate practices of Defendants that are directly responsible for these abuses. Such Plaintiffs may also include others located outside of China who have been or are currently being adversely affected by Defendants' practices.

*Defendants*

17.     Defendant **CISCO Systems, Inc.** ("CISCO") is a California Corporation with offices and locations worldwide.  CISCO is one of the world's largest technology corporations. CISCO is headquartered in San Jose, California, and has offices and a substantial and ongoing business presence in this District.    CISCO designs and sells networking, voice, and communications technology and services.  In doing so, CISCO facilitates the distribution of and access to electronic communication and information through internet networking technology including CISCO Internet Protocol-based networking solutions.

18.     Defendant Thomas Lam has served as the President of CISCO's China Operations since 2005. In this capacity, Mr. Lam oversees CISCO's service and support operations to the PRC. In December 2006, Mr. Lam was selected as "IT Figure of the Year" by China Computer World.  Additionally, Mr. Lam has served as the Vice Chairman of CISCO Greater China since January 2010 where he is responsible for developing and driving strategies for corporate social responsibility, corporate affairs and university relations in Greater China. In these capacities, Mr. Lam oversaw the sale of security technology products and services used by the PRC.

19.     Defendant Owen Chan served as Senior Vice President, Asia Pacific Operations at CISCO from August 2005 to February 2010. Originally joining CISCO in 1999, Mr. Chan has been the President and CEO of the Greater China Theater at CISCO since February 2010. As President and CEO of the Greater China Theater, Mr. Chan is responsible for developing and executing a strategy for marketing CISCO's goods and services to clients in China.

20.     Defendant Rick Justice served as the Executive Vice President of Worldwide Operations and Business Development until his retirement in 2009. In this capacity he oversaw the organization's thousands of sales, systems engineering, and operations employees.  Joining

CISCO in December 1996, Mr. Justice was a key proponent in evolving CISCO's strategy to capture opportunities in emerging markets like China, which helped CISCO double its business in emerging markets in over a three year period. Mr. Justice currently serves as Executive Advisor to the Office of Chairman and CEO.

21.     Defendant John Chambers is the Chairman and CEO of CISCO. Mr. Chambers joined CISCO in 1991 as Senior Vice President, Worldwide Sales and Operations. He has served as CEO since 1995, where he has overseen CISCO's dramatic growth from a corporation with $1.2 billion in annual revenue in 1995 to roughly $40 billion in annual revenue in recent times. Mr. Chambers has overseen all of the organization's operations, including the design, marketing, and sale of services and communications technology in China.

## STATEMENT OF FACTS

### *General Facts*

22.     China has the world's largest population of internet users. China currently has a population of 1.34 billion with approximately 457 million being internet users. Such expansive access to the internet in China has the potential to provide the Chinese people with unparalleled access to information in addition to a venue for public expression and open dialogue on important civic issues.

23.     As early as 1998, the CCP sought to prevent the Chinese people from the free expression of their views by aggressively monitoring the internet, intimidating Chinese internet users, and preventing the dissemination of "harmful" internet content. The Chinese government places strict controls on politically sensitive internet content such as human rights issues in China, the Tiananmen Square massacre, democratic reform in China, and all opposition to the CCP.

24.     The CCP's internet censorship began with the creation of a nationwide surveillance program called the Golden Shield Project, which was launched by China's Public Security Ministry no later than November 2000.  The Golden Shield Project, also known as the "Great Firewall of China," is a sophisticated system of internet filters and censoring techniques which restricts access to a variety of content disfavored by the CCP.  The Golden Shield Project is officially justified as a method to enhance the ability of the CCP to combat criminal activity, but, in reality, it is widely used to suppress peaceful political, social, and religious dialogue of dissent.

25.     The CCP employs a substantial number of internet police to implement the Golden Shield Project, who assist the CCP in preventing the Chinese people from the free expression of their views on the Internet. The CCP employs what has been estimated as between at least 30,000-50,000 internet police. These internet police further the objectives of the CCP by monitoring, tracking and shutting down Internet Protocol (IP) addresses, monitoring, tracking and shutting down e-mail addresses, censoring internet browser search results, and censoring other material the CCP opposes.

26.     The Golden Shield Project has recently curtailed Chinese internet user freedom by blocking content as common as global current events.  Earlier this year, the CCP, utilizing the Golden Shield, heavily censored the pro-democracy revolutions in North Africa, especially in Tunisia and Egypt. On or about January 28, 2011, the CCP began censoring internet content associated with the search term "Egypt." The CCP censorship started only three days after the Egyptian uprising began.

27.     In addition, the Golden Shield Project has blocked or censored nearly all internet content that mentions Liu Xiaobo, the 2010 Nobel Peace Prize laureate. The Golden Shield

Project's enhanced police state capabilities were used against Mr. Liu. In 2009, Mr. Liu was prosecuted for "inciting subversion of state power" and sentenced to eleven years of prison for urging the Chinese government to move towards a freer, more democratic society in his online writings.

28.      CISCO aggressively sought contracts to provide substantial assistance in helping the Chinese government implement the Golden Shield Project. In a 2002 presentation, CISCO described the Golden Shield Project as a source for CISCO opportunities in the areas of planning, construction, technical training, and maintenance.  See **Exhibit A**, CISCO publication titled "Overview of the Public Sector."

29.      In that 2002 CISCO publication, CISCO proffered that networking services were a future direction for security products, showing that CISCO recognized opportunities for future business with the Chinese government.

30.      In that 2002 CISCO publication, CISCO recognized that its services and products would be utilized, *inter alia,* by law enforcement, prisons, forced labor camps, and "forced custody and repatriation centers."  See **Exhibit A**, p. 9.  Such uses are in direct violation of the "Tiananmen Square Sanctions."

31.      In that 2002 CISCO publication, CISCO recognized that its services and products would be utilized, *inter alia,* by CCP's "internet police" and CCP's "information and communication police."  See **Exhibit A**, p. 12 & 14.

32.      In that 2002 CISCO publication, CISCO recognized that its services and products would be utilized by CCP for, *inter alia,* "Internet monitoring & supervision." See **Exhibit A**, p. 19.

33.    In that 2002 CISCO publication, CISCO recognized that its services and products would be utilized by CCP to, *inter alia,* "Drive high-level planning and high standard construction of 'The Golden Shield Project.'" See **Exhibit A**, p. 49.

34.    In that 2002 CISCO publication, CISCO recognized that "Digitalization and networking represent [the] future direction of security protection products." See **Exhibit A**, p. 50.

35.    In that 2002 CISCO publication, CISCO recognized that one of the purposes of the Golden Shield Project (which CISCO was marketing itself to be a part of) was to "Stop the network-related crimes." See **Exhibit A**, p. 57.

36.    In that 2002 CISCO publication, CISCO recognized that one of the purposes of the Golden Shield Project (which CISCO was marketing itself to be a part of) was to "Guarantee the security and services of [the] public network." See **Exhibit A**, p. 57.

37.    In that 2002 CISCO publication, CISCO recognized that one of the purposes of the Golden Shield Project (which CISCO was marketing itself to be a part of) was to "Combat 'Falun Gong' evil religion and other hostiles." See **Exhibit A**, p. 57.

38.    In that 2002 CISCO publication, CISCO recognized that its services and products would be utilized by CCP to, *inter alia,* help "Gain police strength from science & technology" and that CISCO's products would/could be utilized for the creation of a "Prevention & control system of public security." See **Exhibit A**, p. 62-63.

39.    In that 2002 CISCO publication, CISCO marketed itself as a provider of "E-learning" to CCP. See **Exhibit A**, p. 70.

12

40.    As a result of these and other marketing efforts by CISCO, CCP chose to work with CISCO and CISCO successfully aided CCP in the implementation of CCP's Golden Shield Project.

41.    In 2004, Zhang Sihua, the vice president for a Chinese branch company of CISCO said that CISCO was "very glad to cooperate with the police department in building up the first level network of the Golden Shield." It was additionally reported that in 2004, through the use of CISCO routers and other related products, CISCO helped construct the first level network of the Golden Shield Project.

42.    In materials submitted to the House of Representatives Committee on International Relations during a 2006 hearing of the 109th United States Congress, the following facts were disclosed:

a.    CISCO has profited greatly by providing the Chinese government with the technology necessary to filter internet content through its creation of Policenet, one of the tools the regime uses to control the internet. CISCO's estimated profit from sales to China according to Derek Bambauer of *Legal Affairs* is estimated to be $500 million and holds 60 percent of the Chinese market for routers, switches, and other sophisticated networking gear. The company anticipates that China will soon become its third largest market, just behind the U.S. and Japan.

b.    [As of 2006, CISCO was under contract to provide] China with its 12000 Series routers, which are equipped with filtering capability typically used to prevent Internet attacks, but can also be used by [CCP] authorities to block politically sensitive information, according to the Congressional Research Service.

43.     CISCO collaborated with the CCP to design and develop the Golden Shield Project to incorporate advanced information and communication technologies into security enforcement with the primary goal of creating a comprehensive online surveillance system specifically geared to enable and facilitate the suppression of dissident activity in China.

44.     Prior to the Golden Shield Project's development, the CCP was unable to tightly monitor and strictly control China's internet activity. With the assistance of CISCO, the CCP is now capable of detecting, identifying and tracking perceived threats to the CCP's power, and blocking "harmful" websites.

45.     Upon information and belief, CISCO employees customized themselves or trained others to customize CISCO's standard products to meet the Golden Shield Project's unique and non-standard surveillance objectives.

46.     In material submitted to the House of Representatives Committee on International Relations during a 2006 hearing of the 109th United States Congress, the following facts were disclosed:

> a.  According to Harry Wu, The Executive Director of the Laogai Research Foundation, CISCO Systems has marketed its Policenet equipment specifically designed to make it easier for the Chinese Police to carry out surveillance of electronic communications. CISCO is also suspected of giving Chinese engineers training in how to use its products to censor the internet. Policenet currently operates in all but one of China's provinces. Policenet connects officials of the Public Security Bureau—a national agency with local branches that handle security, immigration, "social order," and law enforcement- to each other and to electronic records that store a wealth of information on every citizen in China.

14

Along with Policenet, CISCO also produced the watchdog router that prevents internet users in China from gaining access to banned websites.

b. Reporters Without Borders said that CISCO Systems has sold China several thousand routers at more than 16,000 euros each for use in building the regime's surveillance infrastructure. This equipment that was programmed with the help of CISCO engineers allows the Chinese authorities to read data transmitted on the internet and to spot "subversive" key words. The police are able to identify who visits banned sites and who sends "dangerous" e-mail messages.

47.   In 2002, CISCO explicitly recognized that China uses forced labor as a part of its law enforcement strategy. In 2002, CISCO also recognized that China employs forced custody stations, forced repatriation centers, and forced education centers.  See **Exhibit A**.

48.   In 2002, CISCO explicitly recognized that one of the Chinese government's goals for the Golden Shield Project was to target disfavored groups. In its own presentation documents, CISCO quoted Li Runsen, the Chinese government's information technology lead who stated bluntly that the Golden Shield would be used to "Combat 'Falun Gong' evil religion and other hostiles."  See **Exhibit A**, p. 57.

49.   Recognizing both the enforcement strategy and targets of the Golden Shield Project, CISCO marketed and sold its products to the Chinese Government. In 2006, CISCO's Rick Justice, then senior vice-president for worldwide operations, stated that "[w]e sell to police organizations in many countries." Then, Mr. Justice went on to say that "[w]e do business [in China] the way we do business anywhere."

50.     CISCO marketed internet management systems that could identify dissident internet behavior to the Chinese government and relay that information to Chinese law enforcement authorities.

51.     Plaintiff is informed and believes that CISCO was fully aware that the Golden Shield Project would be used to commit human rights violations and violations of international law.

### *Specific Facts*

**<u>Du Daobin</u>**

52.     Since 2001, Du Daobin ("Du") has published articles on Chinese websites calling for fair treatment of city and rural dwellers, social security and fair wages to farmers, and abolishment of the discriminatory policies of usury towards farmers.  He has published articles on foreign websites strongly criticizing the CCP's policies, ideals, and one-party dictatorship. Additionally, Du has initiated and participated in many petition protest activities on the internet.

53.      On October 28, 2003, Du was criminally detained and arrested while his house was raided by Chinese authorities.

54.      On June 11, 2004, Du was charged with "inciting to subvert state power" and was sentenced to three years in prison. His sentence, however, was suspended for four years.

55.     From 2004 to 2008, the Public Security Bureau ("PSB") communicated with Du approximately twice a month.  Du was not able to use his real name to publish articles domestically or internationally; he was not allowed to leave China and his guests were tightly regulated, questioned and placed under surveillance.  On many occasions, the PSB threatened to hinder the educational advancement of Du's child. Additionally, the PSB regularly intercepted Du's mail and royalty checks.

56.    On July 21, 2008, the PSB reinstated Du's suspended sentence and raided his home.  During his time in prison, Du was subject to physical and psychological torture.  Du was imprisoned under the most stringent controls. He was forced to sit on a low bench for two months which led to cardiac prolapse and difficulty walking.  Due to malnutrition and potassium deficiency, he lost his ability to walk without the assistance of others. During recovery, he was dependent on a wheelchair.  At the same time, Du's wife was continually harassed and abused; and their child was under constant surveillance at school.

57.    Despite Du's prison release in 2010, he is still-bound.  On the day of his release, he was escorted to the Yingcheng City police department. Du was told not to publish anything and to report any departure from Yingcheng City.  He must also report to and participate in weekly community service.

58.    Du has been unemployed for over five months. He does not have stable income, is not allowed to leave the city for work and he is prohibited from leaving China.  He survives on the generosity and assistance of his friends.  His internet activity is constantly monitored, which has slowed down his connection's speed so much that it sometimes takes an hour to load one page.  Additionally, he is constantly redirected to other webpages and is otherwise restricted from using the internet.

59.    Due to the CCP's harassment of Du, his wife has moved out and left him to raise their child.

**Zhou Yuanzhi**

60.     With the rise of the internet, Zhou Yuanzhi ("Zhou") became an active cyber writer. Since the beginning of the 21st century, Zhou has used both his real name and a pen name to publish online articles critical of the CCP.

61.    In or about 2004, Zhou became a regular writer for "Guancha" (www.observechina.net), which is currently run by the Laogai Research Foundation ("LRF").

62.    From 2004 to 2008, he contributed over 40 articles to Guancha, promoting human rights and democracy in China.

63.    In 2007, Zhou became a reporter for Guancha, spending a significant amount of time investigating human rights cases in China.

64.    In the less than two years since he became a reporter for Guancha, Zhou wrote and published approximately 10 reports under a pseudonym.

65.    His articles and activities were closely tracked by local police who, on many occasions, invited him to "drink tea" with them and warned him to stop writing.

66.    On May 3rd, 2008, the local police finally lost their patience when they found in Zhou's email that he was writing a report about China's Laogai products for the LRF. The Jingmen City Public Security Bureau in Hubei Province placed him and his wife, Zhang Zhongfeng into a detention center.

67.    For security reasons, Zhou kept the unfinished report and many related pictures in the draft folder of his Google email account. All the files were copied and deleted by the police on the day Zhou was detained.

68.    Police searched Zhou's home and confiscated his computer, camera, bank documents and other property.

69.    Zhou was severely tortured in the detention center until he confessed that he was writing a report for LRF.

70.    His wife was released three days later, but was placed under house arrest. Zhou was detained for twelve days and was released on May 15, 2008.

71.     Due to a lack of evidence and increasing pressure from international communities, the local police sent Zhou home, but he was put under house arrest for nearly six months, until November 3, 2008.

72.     Although the house arrest formally ended on November 3, 2008, the local police managed to make his home a prison.  During the past three years, Zhou has been under constant police surveillance.  The police have discretely placed a dozen surveillance cameras around his house. The police randomly enter Zhou's house to check his computer.

73.     A prisoner in his own home, Zhou has no way to look for a job. His entire family is sustained by his wife's meager salary.

74.     Political disloyalty is still considered a major offense, so Zhou's son was denied the opportunity to have a decent job after graduating from college. The entire family has fallen victim to political discrimination.

**Liu Xianbin**

75.      For participating in the 1989 Tiananmen Square protests and writing articles demanding political reform, Liu Xianbin ("Liu") was sentenced on December 28, 1992 to two-and-a-half-years in prison for "counterrevolutionary propaganda and incitement."

76.     After his release, he engaged in organizing a branch of the China Democracy Party in Sichuan, and was sentenced to thirteen years on August 6, 1999, on charges of "subverting state power."

77.     During his years of imprisonment, Liu was kept under "strict surveillance." This "strict surveillance" meant Liu was given harsher discipline, harder work, higher likelihood of mistreatment, and less communication and contact with other inmates.

78.     Liu was released on November 6, 2008 from Chuandong Prison (Eastern Sichuan Prison) and placed under close surveillance by local police. Despite constant police harassment, Liu was active in writing and disseminating articles on the internet that promoted human rights and democratization in China. Many of his articles were published on overseas websites, including "Guancha" (www.observechina.net), run by the LRF.

79.     Liu was under physical surveillance with police vans parked in his neighborhood constantly monitoring his words and actions. Liu's house is constantly searched and his property is confiscated. Additionally, Liu's activity on the internet is closely monitored. Police know of every article he has published and every message he has exchanged online.

80.     Between 2009 and 2010, Liu was intimidated by police who threatened to send him back to prison unless he stopped writing. Liu did not comply because he believes freedom of speech is a basic human right.

81.     On June 27, 2010, Liu was detained by police of Suining on suspicion of "inciting subversion of state power." On July 21, 2010, the Suining PSB wrote a Recommendation Indictment to the Suining Procuratorate, requesting that Liu be indicted for "inciting subversion of state power" because he published and disseminated "subversive" articles online.

82.     On the same day Liu was detained, the police ransacked his home and confiscated his computer, books and magazines, and various media storage devices. None of these items have been returned.

83.     On March 25, 2011, Liu was sentenced to ten years in prison for "inciting subversion of state power." Liu received this sentence because of articles that he published during April 2009 and February 2010 in overseas Chinese magazines and websites.

84.    After the trial, Liu was put into Chuanzhong Prison (Central Sichuan Prison). Because he is a repeat offender and refused to confess his guilt, the prison officials and police treated him harshly. The first day he was in prison, he was assaulted by other prisoners at the encouragement of the prison police.

85.    Liu has been tortured psychologically. He has been kept in confinement so that he might yield to authority after undergoing mental pressure. He is not allowed to read uncensored books or materials of his choice; he can only receive information that the authorities want him to have. By doing so, the authorities hope that they will ultimately change his values, beliefs, perceptions, judgments, and then later his mindset and behavior.

## CAUSES OF ACTION

86.    Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions, and treaties:

    a.    Alien Tort Statute, 28 U.S.C. § 1350;

    b.    Torture Victim Protection Act, 28 U.S.C. § 1350;

    c.    Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;

    d.    International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976;

    e.    Universal Declaration of Human Rights (1948) G.A. res. 217A (III), U.N. Doc A/810 at 71;

    f.   Charter of the United Nations (1945), adopted June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153 (*entered into force* October 24, 1945);

    g.   International Labor Organization Convention No. 29 Concerning Forced or Compulsory Labor (1930), *adopted* June 28, 1930, 39 U.N.T.S. 55 (*entered into force* May 1, 1932);

    h.   The Electronic Communications Privacy Act, 18 U.S.C. § 2701, § 2702, and §2511; and

    i.   Statutes and common law of the State of Maryland, including but not limited to assault and battery, false imprisonment, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and unfair business practices.

### FIRST CLAIM FOR RELIEF

**(Torture, a Violation of International Law for Which the Alien Tort Statute and the Torture Victim Protection Act Provide Relief)**

**(By All Plaintiffs Against All Defendants)**

87.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.    Defendants' acts described in this Complaint caused direct and severe physical and mental pain and suffering to the Plaintiffs and placed them at severe risk of personal injury and/or death in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and communication, free association, and the right to hold, exercise and express their political beliefs.

89.    Because the acts enabled by Defendants as described herein violated multiple provisions prohibiting torture on an absolute basis including: (1) treaties binding on the United

States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against torture, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute (ATS), 28 U.S.C. § 1350.

90.     These acts also specifically constitute torture in violation of the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350.

91.      Defendants aided and abetted and/or ratified these acts of torture in violation of international, federal, and state law. These violations and actions meet the definition of torture under the meaning of the TVPA, the ATS, and international treaties and U.S. laws and regulations, as well as customary international law, which condemn torture on an absolute basis, irrespective of the reasons why the abuses are inflicted. These violations also meet the standard for liability established by the TVPA, creating liability for anyone who "subjects", or causes another to undergo torture.

92.     Defendants knowingly violated Art. XVII of the International Covenant on Political and Civil Rights by failing to take action to prevent acts of torture. The ICCPR and customary international law establish a standard for aiding and abetting torture that requires positive steps be taken to prevent acts of torture. Defendants' sale of products to the CCP, directly or indirectly, that they knew would be used to facilitate torture is a violation of this prohibition.

93.     The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## SECOND CLAIM FOR RELIEF

**(Cruel, Inhuman or Degrading Punishment or Treatment or Punishment, Violations of International Law for Which the Alien Tort Statute Provides Relief)**

**(By All Plaintiffs Against All Defendants)**

94.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     These acts of cruel, inhuman, or degrading treatment or punishment suffered by the Plaintiffs designated in this Second Claim for Relief, including physical injury and the severe physical and mental suffering associated therewith, were inflicted upon them by the joint and collusive actions of Defendants and PRC government officials acting under color of law, through unlawful or unauthorized actions prohibited by international law.

96.     These acts had the intent and the effect of grossly humiliating, debasing, intimidating, and punishing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and seeking to break their physical and/or moral resistance.

97.     These acts of cruel, inhuman, or degrading treatment or punishment were inflicted on the Plaintiffs for purposes that include, among others, preventing them from exercising their free speech and free association rights, and punishing them for exercising their right to have and communicate political beliefs.

98.     Because the acts described herein violated the prohibitions against cruel, inhuman, or degrading punishment or treatment including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty

obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman or degrading treatment or punishment, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.

99.    Defendants knowingly aided and abetted and/or ratified these abuses, and did not act to prevent or punish these violations of human rights as embodied in international law.

100.    Defendants are liable for knowingly aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

101.    The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### THIRD CLAIM FOR RELIEF

**(Arbitrary Arrest and Prolonged Detention, a Violation of International Law for Which the Alien Tort Statute and the Torture Victim Protection Act Provide Relief)**

**(By All Plaintiffs Against All Defendants)**

102.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.    These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Third Claim for Relief, including arrest and detention for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly, were inflicted upon them by the joint and collusive actions of Defendants and government officials acting under

color of law, albeit through unlawful or unauthorized actions and for unlawful and unauthorized purposes.

104. These acts caused direct physical and mental pain and suffering upon the Plaintiffs, caused loss of liberty and property, and placed them at severe risk of personal injury in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and free association, and their rights to hold, exercise, and express their political beliefs.

105. Because the acts described herein violated provisions prohibiting arbitrary arrest and prolonged detention including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.

106. Defendants aided and abetted in the carrying out of these abuses, and did not act to prevent or punish these violations of human rights as embodied in international and domestic law.

107. Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

108.    The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### FOURTH CLAIM FOR RELIEF

### (Forced Labor, a Violation of International Law for Which the Alien Tort Claims Act and the Torture Victims Protection Act Provide Relief)

### (By All Plaintiffs Against All Defendants)

109.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    The Plaintiffs were placed in fear for their lives, were deprived of their freedom, and were forced to suffer severe physical and mental abuse associated with forcing them into working in the prison factories in inhumane conditions, by the joint and collusive actions of Defendants and government officials acting under color of law, through unlawful or unauthorized actions.

111.    Because the acts described herein violated provisions prohibiting forced labor including: (1) treaties binding on the United States, (2) international and domestic judicial decisions applying and interpreting the prohibition against forced labor, and (3) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against forced labor, and (4) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Claims Act, 28 U.S.C. § 1350.

112.    Defendants aided and abetted in the carrying out of these abuses, and did not act to prevent or punish these violations of human rights as embodied in international and domestic law.

113.    Defendants are liable for knowingly aiding and abetting and/or ratifying this cause of action.

114.    The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### FIFTH CLAIM FOR RELIEF

### (Battery)

### (By All Plaintiffs Against All Defendants)

115.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116.    On information or belief, Defendants intentionally committed acts that resulted in harmful or offensive treatment of Plaintiffs' persons, and produced bodily harm. Plaintiffs did not consent to the contact and treatment that caused injury, damage, loss or harm to Plaintiffs.

117.    The acts described constitute battery, actionable under the laws of the state of Maryland and the United States.

118.    Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

## *SIXTH CLAIM FOR RELIEF*

### (Assault)

### (By All Plaintiffs Against All Defendants)

119.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.    On information or belief, Defendants' conduct caused Plaintiffs to be subjected to numerous assaults and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to immediate, intentional, offensive and harmful touching.

121.    The acts described herein constitute assault, actionable under the laws of the state of Maryland and the United States.

122.    Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses, as set forth in this cause of action.

## *SEVENTH CLAIM FOR RELIEF*

### (False Imprisonment)

### (By All Plaintiffs Against All Defendants)

123.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    On information or belief, Defendants intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain or confine Plaintiffs on an arbitrary and unlawful basis. The restraint, detention or confinement compelled Plaintiffs to stay or go somewhere against their will for some appreciable time. Plaintiffs did not consent to this restraint, detention or confinement.

125.    Defendants' actions constituted false imprisonment under standards of law applied by the state of Maryland and the United States.

126.    Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses as specified in this cause of action.

### EIGHTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

### (By All Plaintiffs Against All Defendants)

127.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.    On information or belief, Defendants intended to cause Plaintiffs to suffer emotional distress, or, in the alternative, (a) Defendants engaged in the conduct adversely affecting Plaintiffs with reckless disregard of the high probability that it would cause Plaintiffs to suffer severe abuses and emotional distress, (b) Plaintiffs were present at the time the outrageous conduct and these results occurred and (c) Defendants knew that Plaintiffs were present and would be adversely affected.

129.    Plaintiffs suffered severe abuse and emotional distress as a result of the conduct of Defendants.

130.    Defendants' conduct constitutes the intentional infliction of emotional distress and is actionable under the laws, standards, and causes of action of the State of Maryland and the United States.

131.    Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses as set forth in this cause of action.

### NINTH CLAIM FOR RELIEF

### (Negligence)

### (By All Plaintiffs Against All Defendants)

132.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 131 of this Complaint as if fully set forth herein.

133.    On information or belief, Defendants failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs. Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

134.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the causes of action of the State of Maryland and the United States.

135.    Defendants are liable for knowingly aiding and abetting and/or ratifying these abuses as specified in this cause of action.

### TENTH CLAIM FOR RELIEF

### (Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2701, §2702, and §2511, Unlawful Access to Stored Communications)

### (By All Plaintiffs Against All Defendants)

136.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 135 of this Complaint as if fully set forth herein.

137.    Upon information and belief, Defendants violated the rights of Plaintiffs herein by intercepting, disclosing, and/or intentionally using electronic communication between Plaintiffs and other persons. The right of a civil action arises under 18 U.S.C. 2707(a), which provides that any person aggrieved by any violation of the Electronic Communications Privacy Act, "in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind

may, in a civil action, recover from any person or entity, other than the United States, which engaged in that violation such relief as may be appropriate."

138.    Defendants exceeded their authorization to access and control private information concerning Plaintiffs' electronic communications, in violation of 18 U.S.C. § 2701.

139.    Defendants unlawfully and knowingly divulged Plaintiffs' electronic communication contents and user information, in violation of 18 U.S.C. § 2702.

140.    Defendants knowingly aided and abetted the intentional and unlawful acquisition and/or interception of electronic communications sent by and/or received by Plaintiffs through the use of an electronic device. Defendants aided and abetted the intentional and unlawful acquisition and/or interception of communications that had been sent from or directed to Plaintiffs through their use of computers and other electronic devices which were part of, and utilized in, Defendants' electronic communications system, in violation of 18 U.S.C. § 2511 and pursuant to 18 U.S.C. § 2520.

141.    Defendants knowingly aided and abetted the unlawful access, use, and disclosure of Plaintiff's intercepted communications to enhance their business in China. This disclosure was not necessary for the operation of Defendants' system or to protect Defendants' rights or property.

142.    Plaintiffs are "person[s] whose ... electronic communication is intercepted ... or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

143.    Defendants are liable directly and/or vicariously for this cause of action.

144.    Plaintiffs therefore seek remedy as provided for by 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate, damages

consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven

at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred.

### ELEVENTH CLAIM FOR RELIEF

**(Arbitrary Interference with the Right to Privacy, a Violation of International Law and Art. XVII of the International Covenant on Civil and Political Rights for Which the Alien Tort Statute Provides Relief)**

**(By All Plaintiffs Against All Defendants)**

145.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth

in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

146.    Upon information and belief, Defendants violated the rights of Plaintiffs herein by

subjecting them to arbitrary or unlawful interference with their privacy, family, home or

correspondence. These gross violations of the individuals' privacy were inflicted upon them by

the joint and collusive actions of Defendants and PRC government officials acting under color of

law, through unlawful or unauthorized actions prohibited by international law.

147.    These privacy violations were inflicted on the Plaintiffs for purposes that include,

among others, preventing them from exercising their free speech and free association rights, and

punishing them for exercising their right to have and communicate political beliefs.

148.    Because the acts described herein violated the prohibitions against arbitrary

interference with an individual's privacy including: (1) treaties binding on the United States, (2)

statutes adopted by the Congress of the United States implementing those treaty obligations, (3)

international and domestic judicial decisions applying and interpreting the prohibition against

arbitrary interference with individual privacy (4) administrative regulations and international and

domestic judicial decisions applying and interpreting the prohibition against arbitrary

interference with individual privacy and (5) a number of specific, universal, and obligatory

33

standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.

149.    Defendants knowingly aided and abetted and/or ratified these abuses, and did not act to prevent or punish these violations of human rights as embodied in international law.

150.    Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

151.    The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

## ABSENCE OF AVAILABLE AND EFFECTIVE REMEDIES IN CHINA

152.    There is no adequate alternative remedy available in China to Plaintiffs for the claims asserted here.

153.    Chinese attorneys have been disbarred, arrested, and persecuted for their attempts to defend dissident Chinese internet users in Chinese courts. Plaintiffs residing outside of China cannot return to China without danger of serious reprisals, nor can those residing inside China bring suit without danger of serious reprisals.

154.    The Chinese judiciary or legal system does not operate independent of other branches of government and/or of the CCP in China.

155.     Plaintiffs still detained continue to suffer from beatings, sleep and food deprivation, and other forms of torture, cruel, inhuman, or degrading treatment, forced labor, and crimes against humanity.

156.    Plaintiff under surveillance or house arrest continue to have their freedom of movement, expression, and association restricted and their privacy invaded.

157.    Technologies and other measures used to suppress dissident Chinese internet users in China make it virtually impossible for plaintiffs to bring cases in China without reprisal and further persecution of them and their families. In addition, it is virtually impossible for detained dissident Chinese internet users to bring cases in any foreign courts.

158.    Many dissident Chinese internet users in China have attempted to seek administrative remedies against responsible Chinese CCP or State officers. This has resulted in further retaliation against them, including renewed detention, increased persecution, and "disappearance".

**STATEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11(b)(3)**

159.    Due to the unique circumstances of this case, specifically the fact that a substantial amount of the information is unavailable without Defendants' cooperation, the factual allegations in paragraphs 45, 51, 120, 124, 128, 133, 137, 146 are made because they "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," pursuant to Rule 11(b)(3). Fed. R. Civ. P. 11(b)(3).

**PRAYER FOR RELIEF**

160.    WHEREFORE, the Plaintiffs pray for judgment against Defendants, as follows:

    a.    For actual and compensatory damages to each of the Plaintiffs according to proof to be established at trial;

    b.    For punitive and exemplary damages according to proof to be established at trial;

35

c.      For declaratory relief determining that the actions of Defendants constituted violations of international law, specifically, that such violations included prohibited acts of torture, cruel, inhuman or degrading treatment, and arbitrary arrest and prolonged detention for the peaceful and exchange of ideas, views, and political beliefs in violation of the Convention Against Torture, numerous other international treaty obligations binding on the United States, and domestic laws and regulations implementing such standards, including the Torture Victim Protection Act, and other enumerated causes of action in this Complaint;

d.      For affirmative action by Defendants to secure the release of the detainees;

e.      For such other relief as the Court deems just and proper.

Respectfully Submitted,

June 6, 2011

*/S/ Daniel S. Ward_____*
Daniel S. Ward
Ward & Ward, P.L.L.C.
2020 N Street, NW
Washington D.C. 20036
(202) 331-8160
(202) 503-1455 (facsimile)
dan@wardlawdc.com
Counsel for Plaintiffs

*With the assistance of:*
Shaun Kern, Jaime Cardenas-Navia,
and Alec Wright
Georgetown University
Law Center
*Legal Clerks*

36