## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

| | | |
|---|---|---|
| Du Daobin, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 8:11-cv-01538 PJM |
| v. | ) | |
| | ) | |
| CISCO Systems, Inc., et al. | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' OPPOSITION
### TO
### DEFENDANTS' MOTION TO DISMISS

Respectfully Submitted,

August 8, 2013

*/S/ Daniel S. Ward*
Daniel S. Ward
Taimur Rabbani
Ward & Ward, P.L.L.C.
2020 N Street, NW
Washington D.C. 20036
(202) 331-8160
dan@wardlawdc.com

Counsel for Plaintiffs

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ON *KIOBEL* ............................................................. 1

FACTUAL BACKGROUND ..................................................................................... 4

LEGAL ARGUMENT ............................................................................................... 8

I.      LEGAL STANDARD ...................................................................................... 8

II.     THE COURT SHOULD NOT DISMISS PLAINTIFFS' ATS CLAIMS ....... 11

       A.     The Presumption Against Extraterritorial Application Does Not
Bar Plaintiffs' Claims ....................................................................... 11

              1.     The Presumption Against Extraterritoriality Does Not
Apply to Plaintiffs' Claims ................................................... 11

              2.     Plaintiffs' ATS Claims Touch and Concern the United States
with Sufficient Force to Displace the Presumption Against
Extraterritorial Application .................................................. 14

       B.     The FAC Adequately Alleges the Requisite *Mens Rea* and *Actus Reus*
For ATS Claims ................................................................................. 19

              1.     Defendants' Purposefully and Substantially Facilitated Law
of Nationals Violations ........................................................ 19

              2.     Defendants Are Liable Under Aiding and Abetting, Conspiracy,
and Joint Criminal Enterprise Modes of Liability and Misstate the
Appropriate *Mens Rea* Standards ........................................ 22

       C.     Corporations Are Liable Under the ATS ........................................... 25

       D.     Plaintiffs' ATS Claims are Supported by Well-Pled Facts that
Clearly Demonstrate Defendants' Specific and Definite Violations
of International Law ........................................................................... 29

III.    PLAINTIFFS' STATE LAW CLAIMS ARE VALID ................................ 34

       A.     This Court Retains Supplemental Jurisdiction .................................. 34

       B.     State Tort Law Applies ...................................................................... 34

C.      The State law Claims Sufficiently Allege Aiding and Abetting/
        Conspiracy Liability................................................................................37

D.      The FAC Sufficiently Alleges Causation ...............................................39

E.      The FAC States Claims for Infliction of Emotional Distress and
        Negligent Entrustment ...........................................................................40

IV.   PLAINTIFFS' CLAIMS AGAINST JOHN CHAMBERS ARE VALID.......................43

A.      This Court has Personal Jurisdiction Over John Chambers...................43

B.      Plaintiffs Assert Valid Claims Against John Chambers ........................44

C.      Plaintiffs' TVPA Claims Against John Chambers Are Actionable......................45

V.    DEFENDANTS' JUSTICIABILITY ARGUMENT IS MERITLESS.............................46

A.      The Political Question Doctrine Does Not Apply To Plaintiffs' Claims..............46

B.      The Act of State Doctrine Does Not Apply to Plaintiffs' Claims.........................48

C.      The International Comity Doctrine Does Not Apply to Plaintiffs' Claims ...........49

D.      Foreign Affairs Preemption Doctrine Does Not Apply To Plaintiffs' Claims ......50

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                     **Page**

*Adams v. Bain,*
    697 F.2d 1213 (4th Cir.1982) ........................................................................................9

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) ..................................................................................28

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976)....................................................................................................47

*Al Shimari v. CACI Int'l, Inc.,*
    679 F.3d 205 (4th Cir. 2012) ...............................................................................26, 35

*Al Shimari v. CACI Int'l., Inc.,*
    No. 1:08-cv-827(GBL/JFA), 2013 WL 3229720 (E.D. Va. June 25, 2013) ..............17, 18

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) ..................................................................................28

*Al-Quraishi v. L-3 Services, Inc.,*
    657 F,3d 201 (4th Cir. 2011) ......................................................................................26

*Al-Quraishi v. Nakhla,*
    728 F. Supp. 2d 702 (D. Md. 2010)........................................................26, 28, 32, 35, 47

*Aluminum Bahr. B.S.C. v. Alcoa, Inc.,*
    2012 WL 2093997 (W.D. Pa. Jun. 11, 2012) .............................................................4, 12

*Am. Ass'n of Blood Banks v. Boston Paternity, LLC,*
    2009 WL 2366175 (D. Md. July 28, 2009)...................................................................43

*Am. Isuzu Motors, Inc. v. Ntsebeza,*
    553 U.S. 1028 (2008)..................................................................................................22

*Arei II Cases,*
    157 Cal. Rptr. 3d 368 (2013) ......................................................................................38

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................................10

*Aziz v. Alcolac, Inc.,*
    658 F.3d 388 (4th Cir. 2011) .............................................................. 19-25, 29. 45

*Baker v. Carr,*
    369 U.S. 186 (1962)..............................................................................46, 47

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)..................................................................................47

*Beanal v. Freeport-McMoran, Inc.,*
    197 F.3d 161 (5th Cir. 1999) ..................................................................26

*Bigio v. Coca-Cola Co.,*
    239 F.3d 440 (2d Cir. 2000)......................................................................47

*Blazevska v. Raytheon Aircraft Co.,*
    522 F.3d 948 (9th Cir. 2008) ....................................................................35

Bowoto v. Chevron Corp.,
    621 F.3d 1116 (9th Cir. 2010) ..................................................................46

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)..................................................................................42

*Cabello v. Fernández-Larios,*
    402 F.3d 1148 (11th Cir. 2005) ................................................................46

*Carnegie-Mellon Univ. v. Cohill,*
    108 S. Ct. 614 (1988).................................................................................34

*Cedeño v. Castillo,*
    457 F. App'x 35 (2d Cir. 2012) ................................................................12

*Cedeño v. Intech Grp., Inc.,*
    733 F. Supp. 2d 471 (S.D.N.Y. 2010) ......................................................12

*Chevron Corp. v. Donziger,*
    871 F. Supp. 2d 229 (S.D.N.Y. 2012) ......................................................12

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.,*
    792 F. Supp. 2d 1301 (S.D. Fla. 2011) ................................................30, 36

*Corrie v. Caterpillar, Inc.,*
    503 F.3d 974 (9th Cir. 2007) ................................................................42, 46

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000)........................................................................................49

*Cruz v. U.S.,*
  387 F.Supp.2d 1057 (N.D. Cal. 2005) ............................................................48

*Davis Const. Corp. v. Erie Ins. Exch.,*
  CIV. 12-2715 PJM, 2013 WL 2250152 (D. Md. May 20, 2013) .......................9

*Diamond Multimedia Sys., Inc. v. Superior Court,*
  19 Cal. 4th 1036, 968 P.2d 539 (Cal. 1999) ..................................................36

*Diaz-Barba v. Kismet Acquisition, LLC,*
  No. 08-cv-1446, 2010 WL 2079738 (S.D. Cal. May 20, 2010) .......................36

*Doe v. Exxon Mobil Corp.,*
  654 F.3d 11 (D.C. Cir. 2011)(vacated on other grounds)
  09-7125 (D.C. Cir. July 26, 2013) ...............................................26, 27, 28, 46

*Duke v. Feldman,*
  226 A.2d 345 (1967)......................................................................................37

*EEOC v. Arabian Am. Oil Co.,*
  499 U.S. 244 (1991).................................................................................3, 14

*Enahoro v. Abubakar,*
  408 F.3d 877 (7th Cir. 2005) ........................................................................28

*Equal Rights Ctr. v. Camden Prop. Trust,*
  CIV. PJM07-2357, 2008 WL 8922896 (D. Md. Sept. 22, 2008).....................11

*Evans v. B.F. Perkins Co., a Division of Standex Int'l Corp.,*
  166 F.3d 642 (4th Cir. 1999) ..........................................................................8

*Flomo v. Firestone Natural Rubber Co.,*
  643 F.3d 1013 (7th Cir. 2011) ..................................................................26, 28

*Fotso v. Republic of Cameroon,*
  No. 12-cv-1415-TC, 2013 WL 3006338 (D. Or. June 11, 2013) ...............16, 17

*F.T.C. v. Publishing Clearing House, Inc.,*
  104 F.3d 1168 (9th Cir. 1997) .......................................................................44

*Giannaris v. Cheng,*
    219 F. Supp. 2d 687 (D. Md. 2002) ........................................................42

*Green v. Washington Suburban Sanitary Comm'n,*
    269 A.2d 815 (1970) ...............................................................................38

*Gushi Bros. Co. v. Bank of Guam,*
    28 F.3d 1535 (9th Cir. 1994) ..................................................................36

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,*
    642 A.2d 219 (Md. 1994) ........................................................................39

*In Re French,*
    440 F.3d 145 (4th Cir. 2006) ..................................................................49

*In re State of Cal. for L.A. County, Grand Jury Investigation,*
    471 A.2d 1141 (Md. Ct. Spec. App. 1984) ............................................34

*International Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ...............................................................................42

*Jacoves v. United Merch. Corp.,*
    9 Cal. App. 4th 88 (1992) ......................................................................41

*Johnson v. U.S.,*
    170 F.2d 767 (9th Cir.1948) ..................................................................49

*Kadic v. Karadzic,*
    70 F.3d 232 (2d Cir. 1995)................................................................10, 45

*Kerns v. U.S.,*
    585 F.3d 187 (4th Cir. 2009) ..............................................................9, 10

*Khulumani v. Barclay Nat. Bank Ltd.,*
    504 F.3d 254 (2d Cir. 2007).....................................................................22

*Kiobel v. Royal Dutch Petroleum Co.,*
    621 F.3d 111 (2d Cir. 2010).................................................26, 27, 28, 36

*Kiobel v. Royal Dutch Petroleum Co.,*
    133 S. Ct. 1659 (2013) .............................1-4, 8, 10-15, 18, 25-26, 36, 49

*Klinghoffer v. S.N.C. Achille Lauro,*
    937 F.2d 44 (2nd Cir.1991).....................................................................47

*Lab. Corp. of Am. v. Hood,*
  911 A.2d 841 (Md. 2006) ...................................................................35

*Liu Bo Shan v. China Constr. Bank Corp.,*
  421 F. App'x 89 (2d Cir. 2011) ............................................................20

*Lizarbe v. Rondon*
  642 F. Supp. 2d 473 (D. Md. 2009)........................................24, 25, 46, 47

*Mamani v. Berzain,*
  654 F.3d 1148 (11th Cir. 2011) ............................................................48

*Maryland v. Louisiana,*
  451 U.S. 725 (1981)...........................................................................49

*McMahon v. Presidential Airways, Inc.,*
  502 F.3d 1331 (11th Cir. 2007) ...........................................................47

*Mertik Maxitrol GMBH & Co. KG v. Honeywell Tech. SARL,*
  No. 10-cv-12257, 2012 WL 748304 (E.D. Mich. Mar. 6, 2012).....................35

*Mohammadi v Islamic Republic of Iran,*
  No. 09-cv-1289 BAH, 2013 WL 2370594 (D.D.C. May 31, 2013) ............16, 17

*Morrison v. Nat'l Australia Bank Ltd.,*
  130 S.Ct. 2869 (2010)................................................10, 11, 13, 25, 26

*Mox, Inc., v. Woods,*
  202 Cal. 675 (1927) ...........................................................................38

*Mwani v. bin Laden,*
  No. 99-125, 2013 WL 2325166 (D.D.C. May 29, 2013)..............................17

*Mylan Laboratories, Inc. v. Akzo, N.V.,*
  2 F.3d 56 (4th Cir. 1993) ....................................................................11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
  591 F.3d 250 (4th Cir. 2009)...........................................................10, 11

*Permanent Fin. Corp. v. Taro,*
  526 A.2d 611 (Md. Ct. Spec. App. 1987) ................................................35

*Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,*
  831 F.2d 522 (4th Cir. 1987) ...............................................................43

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    582 F.3d 244 (2d Cir. 2009)....................................................................................21, 22

Prosecutor v. Tadic,
    Case No. IT-94-1-A, Judgment, ¶ 178 (July 15, 1999).................................................. 25

*Puryear v. Shrader,*
    CIV. PJM 11-3640, 2013 WL 1833262 (D. Md. Apr. 30, 2013) .......................8, 9, 10, 45

*Reedy v. Precyse Solutions LLC,*
    1:12-CV-02061-AWI, 2013 WL 1563254 (E.D. Cal. Apr. 12, 2013).............................41

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States,*
    945 F.2d 765 (4th Cir. 1991) ...........................................................................................9

*Romero v. Drummond Co.,*
    552 F.3d 1303 (11th Cir. 2008) ................................................................................26, 45

*Saleh v. Titan Corp.,*
    580 F.3d 1 (D.C. Cir. 2009)............................................................................................49

*Sarei v. Rio Tinto, PLC,*
    671 F.3d 736 (9th Cir., 2011) (en banc), *cert. granted and judgment vacated*,
    No. 11-649, 2013 WL 1704704 (U.S. Apr. 22, 2013), *affirming dismissal on*
    *remand*, No. 02-56256, 2013 WL 3357740 (9th Cir. Jun. 28, 2013) .........................16, 26

*Saunders v. Superior Court,*
    27 Cal. App. 4th 832 (1994) ..........................................................................................37

Schramm v. Foster,
    341 F. Supp. 2d 536 (D. Md. 2004)................................................................................41

*Seward v. State,*
    208 Md. 341, 118 A.2d 505 (1955) ................................................................................37

*Smith v. Commc'ns Works of Am. (CWA)-Dist. 2,*
    8:12-CV-00027-AW, 2012 WL 6021506 (D. Md. Dec. 3, 2012) ......................................9

*Sorota v. Sosa,*
    842 F. Supp. 2d 1345 (S.D. Fla. 2012) ..........................................................................12

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004).......................................................................11-12, 16, 23, 26-29, 32

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
    303 U.S. 283 (1938)............................................................................................33

*Sullivan v. City of San Rafael*,
    C 12-1922 MEJ, 2013 WL 3357933 (N.D. Cal. July 2, 2013) .........................41

T *K Morrison v. Nat'l Australia Bank Ltd*,
    130 S.Ct. 2869 (2010)...........................................................10, 11, 13, 25, 26

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
    493 U.S. 400 (1990)............................................................................................48

*Wiwa v. Royal Dutch Petroleum Co.*,
    96 CIV. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002)............................46

*Wong v. Tai Jing*,
    189 Cal. App. 4th 1354  (2010) ...................................................................40, 41

*Wyeth v. Levine*,
    555 U.S. 555 (2009)............................................................................................50

*Yusuf v. Samantar*,
    No. 1:04-CV-1360, 2012 WL 3730617 (E.D. Va. Aug. 28, 2012).................20

*Zimmerman v. Novartis Pharmaceuticals Corp.*,
    889 F.Supp.2d 757 (citing *Wyeth v. Levine*, 555 U.S. 555, 565 n. 3 (2009) ...................50

## **<u>Statutes and Rules</u>**

18 U.S.C. § 1961–1968 (RICO) ...........................................................................12

28 U.S.C. § 1367    ..........................................................................................34

Fed. R. Civ. P. 12(b)(1)..........................................................................................8

Fed. R. Civ. P. 12(b)(6).........................................................................................10

Rome Statute of the International Criminal Court,
    Art. 30    ........................................................2-3, 24, 26, 29-30, 45

## <u>Miscellaneous</u>

Committee Against Torture, General Comment No. 2, ¶ 3,
U.N. Doc. CAT/C/GC/2/CRP.1/Rev.4 (Nov. 2007)...........................................................32

International Covenant on Civil and Political Rights, art. 14,
Dec. 19, 1966, 999 U.N.T.S. 171; CAT, art. 15, Dec. 10, 1984,
S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113................................................................33

Report of the International Law Commission,
p. 47, U.N. Doc. A/51/10 (1996), at
http://untreaty.un.org/ILC/reports/english/A_51_10.pdf...................................................30

Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("D.Mem.") distorts the facts in the First Amended Complaint ("FAC") and relevant case law. Defendants provide no convincing reason to dismiss the FAC at this early stage, before even a scrap of discovery has been exchanged. As detailed herein, this Court should deny Defendants' Motion.

## <u>PRELIMINARY STATEMENT ON *KIOBEL*</u>

Defendants repeatedly mischaracterize the nature of the Supreme Court's holding in *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013). Defendants claim, for example, that the Supreme Court made the application of the Alien Tort Statute ("ATS") "decisively clear." *D.Mem.* at 13. Defendants further claim (inaccurately) that "dismissal would be in keeping with the decisions of every court considering similar ATS allegations" and that these courts followed "the Supreme Court's clear guidance." *Id*. at 14. These arguments mischaracterize the *Kiobel* decision. In reality, seven Justices expressed that the *Kiobel* holding was not nearly as broad or conclusive as Defendants claim.

Justice Kennedy, the critical fifth vote for the majority opinion, wrote separately from the majority and specified that the Supreme Court "was careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute." *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J., concurring). Justice Kennedy continued that "in [some cases with allegations of serious violations of international law principles protecting persons] the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation." *Id*. Justice Alito, joined by Justice Thomas, stated that the holding "obviously leaves much unanswered." *Id*. at 1669 (Alito, J., concurring). Justice Breyer, joined by Justices Ginsburg, Sotomayor, and Kagan, relying on foreign relations law, would grant jurisdiction "where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an

1

important American national interest" including "a distinct interest in preventing the United States from becoming a safe harbor . . . for a torturer or other common enemy of mankind." *Id*. at 1671 (slip. Op. at 7) (Breyer, J., concurring). The *Kiobel* holding is intentionally nowhere as "decisive" as Defendants assert, and it does not foreclose Plaintiffs' ATS claims *sub judice*.

The Supreme Court held that the presumption against extraterritorial application ("PAE") applies to the ATS. *Id*. at 1669. The Supreme Court stated that the PAE can be "displaced." *Id*. In *Kiobel*, plaintiffs brought an ATS claim against Dutch, British, and Nigerian corporations whose only U.S.-connection was an office owned by a separate corporate affiliate. *Id*. In its narrow decision, the Supreme Court held that, under the specific facts, where defendants are foreign, plaintiffs are foreign, "all the relevant conduct" occurred outside U.S.-territory, and a defendant's only U.S.-connection is "mere corporate presence," the claims did not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id*. The PAE thus applies to extraterritorial applications of the ATS, and ATS claims displace the PAE if they sufficiently "touch and concern" the United States beyond a defendant's "mere corporate presence." *Id*.

The Supreme Court, while leaving open the precise parameters of when an ATS claim is available, did offer helpful guideposts this Court can use to determine when the PAE applies and when ATS claims sufficiently "touch and concern" the territory of the United States. The Supreme Court *did not* hold that for the PAE to be displaced, conduct occurring in the United States must itself rise to an actionable violation of an international law norm under the ATS. Rather, only two of the nine Supreme Court Justices espoused this view. *Id*. at 1670 (Alito, J., concurring). Nor would that construction be reconcilable with the majority's actual holding in *Kiobel* because it would only speak to whether there is an extraterritorial application of the ATS, not to whether that application can be displaced. If a defendants' U.S. conduct

rises to an actionable violation of the law of nations, there is no extraterritorial application of the ATS and the PAE would not apply. Because the PAE would not apply, there would be no need to ask whether the PAE is "displaced" or whether the claims "touch and concern" U.S. territory "with sufficient force." *Id*. at 1669. This is the reading Defendants espouse. *D.Mem*. at 19. This incorrect reading renders moot the "carefully" crafted language of the majority opinion, *Kiobel*, 133 S.Ct. at 1669 (Kennedy, J., concurring), which states that even when the PAE applies to ATS claims, those claims can "displace" the PAE if they "touch and concern" U.S. territory with "sufficient force." *Id*.

The Supreme Court *did not* hold that a defendant's U.S. nationality is insufficient to displace the PAE. Rather, the Court carefully held that "mere corporate presence" in the United States was insufficient to displace the PAE. *Id*. "Mere corporate presence" and "nationality" are entirely different concepts, and the distinction was certainly not lost on the Supreme Court. Where defendants are U.S. nationals, the risk of negative implications on U.S. foreign policy are far reduced when compared to instances where Defendants only have a "mere corporate presence" in the United States. *Id*. The PAE "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian American Oil Co*., 499 U.S. 244, 248 (1991) ("*Aramco*"). The risk of "unintended clashes," *id*., is far diminished in ATS claims against U.S. nationals and thus the rationale behind the PAE is less applicable to such claims. The majority opinion in *Kiobel* demonstrated that the availability of a claim against a country's own citizens does not carry the foreign policy risks that the availability of a claim against another country's citizens carries. *Kiobel* 133 S.Ct. at 1669 ("[m]oreover, accepting petitioners' view would imply that other nations, also applying the law of nations *could hale our citizens into their courts* for alleged violations of the law of nations…") (emphasis added). The United States has a great interest in hearing cases alleging law of nations violations by U.S. defendants. Indeed,

3

four Justices, relying on foreign relations law, would grant ATS jurisdiction "where distinct American interests are at stake," *id*. at 1674 (Breyer, J., concurring), including automatically in all cases involving U.S. defendants. Every Supreme Court Justice in *Kiobel* thus confirm that U.S. citizenship is distinct from "mere corporate presence," and that the distinction is important in the ATS context.. Post-*Kiobel*, an ATS claim survives where the only U.S.-nexus is the U.S. nationality of the Defendant.

*Kiobel* and related jurisprudence offer the following important boundaries. The PAE applies to extraterritorial applications of the ATS. *Id*. at 1669. PAE jurisprudence holds that the PAE does not apply to claims where conduct occurs overseas but "decision-making vital to the sustainability of the enterprise" comes from the United States. *Aluminum Bahr*. *B*.*S*.*C*. *v*. *Alcoa, Inc*., 2012 WL 2093997, at *3 (W.D. Pa. Jun. 11, 2012). If the PAE applies, ATS claims survive if they "touch and concern" U.S. territory. *Kiobel*, 133 S.Ct at 1669. "Mere corporate presence" in the United States is insufficient but the Defendant's U.S. nationality can sufficiently "touch and concern" U.S.-territory with enough force to "displace" the PAE. *Id*. A Defendant's U.S. conduct can also displace the PAE, but does not itself need to rise to an actionable international law violation to sufficiently "touch and concern" U.S. territory. *Id*.

Plaintiffs' claims are against a U.S. company and a U.S. citizen for conduct that those entities conceived, designed, marketed, supported, lobbied for, and took significant steps to further, from the United States. FAC ¶¶ 7, 27, 81, 109. The volume and type of U.S. conduct renders the PAE inapplicable. Even if the PAE applied, Defendants' U.S. nationality and U.S. conduct are sufficient to displace the PAE.

## **FACTUAL BACKGROUND**

Plaintiffs are Chinese political dissidents who have been tortured, persecuted, subjected to crimes against humanity, and have faced other brutalities that violate the law of nations, the law of the United States, and the laws of Maryland and California. Plaintiffs have all been tortured while in administrative

4

detention or imprisonment, and have faced other violations of the law of nations prior to sentencing, or pursuant to sentencing devoid of basic due process due to the torture that preceded their sentencing.

Plaintiff **Du Daobin** ("Du") has suffered severe torture leading to cardiac prolapse, crippling, and difficulty walking. FAC ¶¶ 123-125. Du suffered this torture, as well as harassment and other grave harm, on the basis of his online activity. *Id.* ¶¶ 117, 122. Du published articles under pseudonyms, detected with CISCO technology, and these articles were the basis for the harms that Du suffered. *Id.* ¶¶ 116, 121.

Plaintiff **Zhou Yuanzhi** ("Zhou") authored a number of reports of human rights abuses in the People's Republic of China ("PRC") under a pseudonym. *Id.* ¶ 133. Zhou was detained, severely tortured, and otherwise subjected to gross violations of his basic human rights, on the basis of these anonymous articles and on unsent items kept in his draft email folder. *Id.* ¶¶ 129-149. These articles and unsent email content that formed the basis of Zhou's torture were only discovered using CISCO technology expressly designed for the purpose of discovering and cracking down on political dissidents. *Id.* Zhou's family is regularly harassed in connection with Zhou's anonymous internet activity. *Id.*

Plaintiff **Liu Xianbin** ("Liu") has been tortured and subjected to grave violations of his fundamental human rights on the basis of his internet activity. *Id.* ¶¶ 150-162. This torture includes repeated physical violence, mental punishment, solitary confinement, exposure to harsh lights, and no access to a bed, chair, toilet, or window in a 10' x 10' room. *Id.* These violations of his fundamental rights are on the basis of his internet activity, instantly tracked and cataloged using CISCO technology created for the expressed purpose of cracking down on political dissidents like Du, Zhou, and Liu. *Id.*

Cisco Systems, Inc. ("CISCO"), a U.S. company, and John Chambers ("CHAMBERS"), a U.S. national, purposefully and substantially facilitated grave violations of the basic human rights of peaceful Chinese dissidents. FAC ¶¶ 1-10, 26-43, 117, 134, 155-156. Defendants aided and abetted, conspired with,

and entered a joint criminal enterprise ("JCE") with the express purpose of perpetrating the heinous activities detailed in the FAC. FAC ¶¶ 163-179. Acting predominantly out of the United States, and through decisions made in its U.S.-offices, the U.S.-based Defendants, among other things, designed, marketed, developed, constructed, implemented, sourced, trained others in, and supported the Golden Shield. FAC ¶¶ 2, 4-8, 26-43. The Golden Shield was used for the precise purpose Defendants marketed and developed it: to persecute peaceful dissidents such as Plaintiffs and submit them to grave violations of their human rights. FAC ¶¶ 1-10, 16-43, 53, 112-115.

Defendants' specific intent is detailed in the FAC. Defendants acknowledged that they sought to facilitate the Chinese Communist Party (CCP) in efforts to *douzheng[1]* elements hostile to the CCP. FAC ¶¶ 47-48, 79. Defendants acknowledged that the purpose of the Golden Shield was to eradicate specific dissidents, and described this specific persecution as lucrative. *Id*. ¶ 87. CISCO, under CHAMBERS' direction, created marketing materials and otherwise advertised CISCO technology that comprised the Golden Shield, and specifically stated that it sought to help *douzheng* political dissidents, intending the CCP to rely on CISCO to further this *douzheng* campaign. *Id*. ¶¶ 2-5, 84-85. Defendants specifically marketed CISCO technology to *douzheng* dissidents including Plaintiffs. *Id*. ¶¶ 47-48, 73-79. Defendants trained CCP officials to use the technology for this purpose. *Id*. ¶¶ 56-57, 77, 88-89. Engineers implementing the Golden Shield are adamant that CISCO customized the technology to facilitate the heinous acts. *Id*. ¶ 63. Knowing these atrocities were occurring using CISCO technology, Defendants continued facilitating these atrocities through ongoing support, resources, and services. *Id*. ¶¶ 64, 76.

Defendants' conduct is directly traced to the United States. CISCO's corporate structure has all vital decision-making central to the creation, marketing, development, implementation, and support for

---

[1] "*Douzheng*" is an inflammatory word invoking and referencing a specific persecution entailing annihilating millions of people, the implications of which were doubtlessly known to Defendants (who pursued associated opportunities).  FAC ¶ 48.

the Golden Shield come from the United States, and Defendants sourced the Golden Shield from the United States. *Id*. ¶ 81. This U.S.-based sourcing included the conception, creation, approval, design, development, marketing, ratification, selling, investment in, support for, and other relevant activities central to the use of the Golden Shield to injure Plaintiffs. *Id*. CISCO employees and agents directly implementing the technology traveled to the United States to facilitate the use of CISCO technology for the heinous actions detailed in the FAC. *Id*. ¶¶ 32, 36, 40. CISCO employees and officers lobbied the Congress of the United States in direct relation to Defendants' role(s) in facilitating the actions detailed in the FAC. *Id*. ¶ 109. Defendants, acting in the United States, designed, created, serviced, updated and supported, and customized the technology that comprises the Golden Shield. *Id*. ¶ 83.

Defendants' conduct directly led to gross and multiple violations of Plaintiffs' basic human rights. Plaintiffs were viciously beaten, forced to sit on an extremely low bench in a crippling manner, kept awake for 20+ hours a day, otherwise severely tortured in heinous ways, and otherwise detained and forced into labor through proceedings devoid of any basic due process of law. Defendants' actions directly and purposefully facilitated these harms. For example, Zhou was repeatedly tortured for an article he had not yet published, that was only detected using CISCO technology. FAC ¶¶ 18-20, 134-138. Liu was told while being tortured that officials knew of his activity because of the technology CISCO designed for that purpose. FAC ¶ 159. In a sea of over 460 million internet users, CISCO's technology allowed instant tracking, monitoring, detaining, and torturing of dissidents for their internet use, regardless of how well known those users were to police. FAC ¶¶ 44-45. Plaintiffs were tortured for articles they had not yet published and for articles they wrote using pseudonyms. FAC ¶¶ 121-125, 133-138, 159. Plaintiffs were tortured for the entire breadth of their internet activity, which CCP officials could not have known, let alone instantly and contemporaneously accessed, without CISCO technology. FAC ¶¶ 65-68. CISCO's

7

technology was essential to the heinous activities detailed in the FAC. Defendants specifically marketed CISCO to the CCP and designed its technology to enable CCP officials to track, detain, and *douzheng* dissidents beyond what was previously possible. FAC ¶¶ 74-79. Plaintiffs were subject to grave violations of basic human rights as a direct result of their being apprehended via CISCO technology. FAC ¶¶ 3,78.

Defendants' gross mischaracterization of the facts alleged in the FAC lacks merit and substance. The FAC demonstrates how Defendants, operating in the United States, undertook substantial effort to develop and deploy the Golden Shield. The FAC demonstrates how, without Defendants' significant and purposeful action, the crimes against humanity, torture, cruel, inhuman, and degrading treatment and punishment, and other tortious activity would not have been possible. The FAC demonstrates how Defendants purposefully entered into a JCE to facilitate these acts and how Defendants entered into agreements to further these acts. Plaintiffs have properly pled and supported their claims. The *Kiobel* ruling does not preclude Plaintiff's claims. Defendants' Motion must fail.

## <u>LEGAL ARGUMENT</u>

## I.    LEGAL STANDARD

Fed. R. Civ. P. 12(b)(1) governs dismissal for lack of "subject-matter jurisdiction." "The plaintiff bears the burden of proving that jurisdiction exists in federal court." *Puryear v. Shrader*, CIV. PJM 11-3640, 2013 WL 1833262 (D. Md. Apr. 30, 2013) (citing *Evans v. B.F. Perkins Co., a Division of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). "When considering a 12(b)(1) motion, the court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment' to help determine whether it has jurisdiction over the case before it." *Id*. (citing *Evans*, 166 F.3d at 647). "A Rule 12(b)(1) motion places the district court in the role of a fact finder for the limited purpose of assessing disputes over allegations critical to establishing subject matter jurisdiction" including through

the use of an evidentiary hearing and the review of affidavits, pleadings, depositions, and testimony. *Davis Const. Corp. v. Erie Ins. Exch.*, CIV. 12-2715 PJM, 2013 WL 2250152 (D. Md. May 20, 2013) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)). "A Court should grant a 12(b)(1) motion 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.' *Puryear*, 2013 WL 1833262 at *1 (citing *Richmond, Fredricksburg & Potomac R.R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991). Dismissal under 12(b)(1) is inappropriate here.

Further, "where the defendant contends that the complaint fails to allege facts sufficient to establish subject matter jurisdiction, all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Smith v. Commc'ns Works of Am. (CWA)-Dist. 2*, 8:12-CV-00027-AW, 2012 WL 6021506 (D. Md. Dec. 3, 2012) (quoting *Adams*, 697 F.2d at 1219) (quotation marks omitted). Here, Defendants' basis for a 12(b)(1) motion is not derived from a dispute over the veracity of Plaintiffs' jurisdictional allegations. *See Kerns v. U.S.*, 585 F.3d 187 (4th Cir. 2009). Defendants' motion derives instead from arguments about the sufficiency of the allegations. The claims under the 12(b)(1) motion's umbrella relate specifically *not* to the allegations' truth but instead to their sufficiency. *See D.Mem.* at 2 ("The ATS claims should be dismissed for *failure to allege* subject matter jurisdiction . . . because the ATS does not apply to . . . conduct *alleged here* and *the FAC fails to allege* conduct . . . *the allegations fail to allege . . . the allegations fail to plead* . . .). Defendants couch jurisdiction arguments in arguments over the sufficiency of the allegations. Plaintiffs are entitled to the procedural protections of 12(b)(6).

Further, "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute," "the entire factual dispute is appropriately resolved only by a proceeding on the merits." *Adams*, 697 F.2d at 1219. Defendants have "challenged not only the court's jurisdiction but also the existence of

9

the plaintiff's cause of action. A trial court should then afford the plaintiff the procedural safeguards—such as discovery—that would apply were the plaintiff facing a direct attack on the merits." *Kerns*, 585 F.3d at 193. The jurisdictional issue is intertwined with the merits of a claim, and the ATS "requires a more searching review of the merits." *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).

Under Fed. R. Civ. P. 12(b)(6), a party may move to dismiss a Complaint for "failure to state a claim upon which relief can be granted." A 12(b)(6) motion "tests the sufficiency of a complaint, but does not resolve factual contests, the merits of a claim, or the applicability of defenses." *Puryear*, 2013 WL 1833262 at *1 (citations omitted). A court evaluating a 12(b)(6) motion "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff." *Nemet Chevrolet, Ltd. V. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court considering a 12(b)(6) motion also "draws any reasonable factual inferences in favor of the plaintiff." *Puryear*, 2013 WL 1833262 at *1 (internal citation omitted). A court should grant a 12(b)(6) motion only "if the plaintiff cannot provide enough factual support to establish a facially plausible claim or create a reasonable inference of defendant's culpability." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the detailed facts, construed in the light most favorable to the Plaintiffs, show that dismissal is unwarranted.

The PAE's application is a merits question and does not speak to subject matter jurisdiction. *Kiobel* does not implicate Rule 12(b)(1). In *Kiobel*, the Supreme Court analyzed the PAE through the framework of *Morrison v. Nat'l Australia Bank Ltd*, 130 S.Ct. 2869 (2010). 133 S.Ct. at 1664. *Morrison* specified that the Second Circuit incorrectly "considered the extraterritorial reach [of the underlying statute] to raise a question of subject-matter jurisdiction." *Morrison*, 130 S.Ct. at 2877. *Morrison* further held that, like forms of liability and questions of who may be liable, the extraterritorial reach of a statute goes to the merits. *Id.* ("[T]o ask what conduct [a statute] reaches is to ask what conduct [that statute] prohibits, which

10

is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case.") (internal citations omitted). The Supreme Court affirmed the *Morrison* approach in *Kiobel*. 133 S.Ct. at 1664 ("The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim *may reach* conduct occurring in the territory of a foreign sovereign") (emphasis added). Although the ATS is "strictly jurisdictional," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004), Rule 12(b)(6), not 12(b)(1), governs the inquiry whether Plaintiffs seek extraterritorial application and whether the PAE is displaced. *Kiobel*, 133 S.Ct. at 1664; *Morrison*, 130 S.Ct. at 2877. Since Rule 12(b)(6) governs the PAE's application, the Court should accept "all well-pled facts as true" and construe "these facts in the light most favorable to the plaintiff." *Nemet Chevrolet* 591 F.3d at 255.

Absent an evidentiary hearing, when a district court decides a 12(b)(2) motion, a "plaintiff need only prove a prima facie case of personal jurisdiction." *Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) (citation omitted). "In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Id.* (citations omitted). "[T]he limits of Maryland's long-arm statute for the exercise of personal jurisdiction are conterminous with the limits of the Due Process Clause of the United States Constitution." *Equal Rights Ctr. v. Camden Prop. Trust*, CIV. PJM07-2357, 2008 WL 8922896 at *3 (D. Md. Sept. 22, 2008) (citations omitted).

## II.   THE COURT SHOULD NOT DISMISS PLAINTIFFS' ATS CLAIMS

### A.  The Presumption Against Extraterritorial Application Does Not Bar Plaintiffs' Claims

#### 1.  The Presumption Against Extraterritoriality Does Not Apply to Plaintiffs' Claims.

*Kiobel* held that the PAE applies to the ATS. 133 S.Ct. at 1669. *Kiobel* also narrowly held that that the PAE applied to the *Kiobel* plaintiff's claims because "all the relevant conduct" occurred outside U.S.

11

territory. *Id*. Defendants interpret *Kiobel* to mean that where tortious conduct is conceived of, developed, marketed, lobbied for, supervised, directed, ratified, invested in, and otherwise controlled from U.S. territory, FAC ¶ 81, "all the relevant conduct" relating to the tortious activity "took place outside the United States." *D.Mem*. at 14. Defendants' reading is irreconcilable with the policy underlying the PAE, with established jurisprudence of courts interpreting the conduct to which the PAE applies, and with common sense. The FAC demonstrates that the PAE does not apply here. Plaintiffs' claims do not require extraterritorial ATS application. Even if the PAE applied, it would be displaced.

Applying the PAE to claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–1968, courts have found that the PAE didn't apply if "the scheme . . . allegedly was conceived and orchestrated in and from the United States" and "acts in [furtherance of the scheme] were committed here by Americans and in Ecuador by both Americans and Ecuadorians." *Chevron Corp*. *v*. *Donziger*, 871 F.Supp.2d 229, 245 (S.D.N.Y. 2012). The PAE does not apply where a scheme "was conceived, orchestrated and directed" by "domestically located" Defendants. *Alcoa*, 2012 WL 2093997 at *2-3 (Complaint withstands 12(b)(6) motion when "[t]he control of the enterprise, the decision-making vital to the sustainability of the enterprise, came from [the United States].")

Conversely, courts have found the PAE applies where the "enterprise and the impact of the predicate activity upon it are entirely foreign." *Cedeño v*. *Intech Grp*., *Inc*., 733 F.Supp.2d 471, 474 (S.D.N.Y. 2010) *aff'd sub nom*. *Cedeño v*. *Castillo*, 457 F. App'x 35 (2d Cir. 2012) (PAE applies where the "scheme's contacts with the United States . . . were limited to the movement of funds into and out of U.S. accounts."). *See also Sorota v*. *Sosa*, 842 F.Supp.2d 1345, 1350  (S.D.Fla. Jan. 31, 2012) (PAE applies where an enterprise "operated entirely in Peru, with its only connection to the United States being that the funds it possessed originated from (and possibly returned to) a Florida bank account").

Unlike post-*Morrison* cases dismissing cases under the PAE, and unlike *Kiobel* where plaintiffs' claims were dismissed because "*all* the relevant conduct took place outside the United States," 133 S.Ct. 1669 (emphasis added), Plaintiffs' claims do not require extraterritorial application. The FAC clearly alleges that Defendants orchestrated, directed, ratified, controlled, and otherwise supported in critical ways the use of CISCO technology to further the heinous activities detailed in the FAC. CISCO's corporate structure necessitates that its extensive and ongoing support came from the United States. FAC ¶¶ 26-43, 81. Defendants' agents undertook lobbying activities in the United States to further their tortious conduct. *Id*. ¶ 109. CISCO's high-level communications in furtherance of its tortious conduct occurred in the United States, and Defendants directed this conduct from the United States. *Id*. ¶¶ 32, 36, 40, 42-43. CISCO derived extensive profits for its U.S.-based headquarters from its tortious conduct, and the direction of this conduct from the United States is further demonstrated through the U.S. Congress seeking testimony from U.S. persons specifically related to this tortious conduct. *Id*. ¶¶ 104, 108. CISCO, in deals necessarily directed and ratified in its U.S. offices, confirmed deals to train CCP officials in relevant surveillance technology developed in the United States. *Id*. ¶ 56. The FAC sufficiently alleges that CISCO's employees, officers, and agents in its U.S.-offices designed, created, serviced, updated, and/or otherwise supported the Golden Shield and later customized this technology for the purpose of facilitating the heinous acts detailed in the FAC. *Id*. ¶ ___. Until at least as recently as 2008, CISCO's U.S. offices handled all relevant and ongoing customer service requests for the Golden Shield. *Id*. ¶ 8. CISCO's U.S. officers (including CHAMBERS) traveled overseas to focus on a project in the PRC, *id*. ¶ 41, and worked from the U.S. to source the Golden Shield for the purpose of facilitating the tortious conduct. *Id*. ¶ 42.

The FAC demonstrates that Defendants conceived of, planned, orchestrated, directed, ratified, approved, and controlled the tortious conduct from the United States, and that Defendants exercised

13

ongoing control and provided critical support to further their tortious conduct from the United States. The PAE "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248. No such discord is risked where a court does not dismiss claims against U.S. defendants that specifically orchestrated and supported tortious conduct from the U.S. This Court should not apply the PAE to this domestic application of the ATS.

### 2. Plaintiffs' ATS Claims Touch and Concern the United States with Sufficient Force to Displace the Presumption Against Extraterritorial Application.

Defendants argue that the "conduct or injuries" detailed in the FAC do not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *D.Mem.* at 16 (citing *Kiobel*, 133 S.Ct. at 1669). As a preliminary matter, the Supreme Court's careful wording maintained not that *conduct and injuries* must touch and concern the United States to displace the PAE, but rather that the "claims" must do so. *Kiobel*, 133 S.Ct. at 1669. The Supreme Court in its very next sentence continues to clarify that "[c]orporations are often present in many countries, and it would reach too far to say that *mere* corporate presence suffices," *Id*. (emphasis added).

The *Kiobel* mention of a degree of corporate presence would be *non sequitur* if this Court were to espouse Defendants' reading that only conduct or injury can touch or concern the United States. This Court should refuse to render the Supreme Court's "careful" words *non sequitur*. *Id*. (Kennedy, J., concurring). The logical reading of the opinion is instead that an ATS claim sufficiently displaces the PAE where the nexus with the United States is some level of corporate activity beyond "mere corporate presence," including, for instance, U.S. nationality, as exists here. *See Preliminary Statement, supra*. Even if this Court were to apply the PAE, Defendants' U.S. nationality itself sufficiently displaces the PAE, *id*., - even more so when paired with Defendants' extensive U.S. conduct.

The FAC demonstrates that Defendants' conduct sufficiently touches and concerns U.S. territory. *Supra* II(A)(1). Where U.S. defendants orchestrate, direct, and ratify their conduct from the United States, the PAE does not apply. *Id*. Even if it were to apply, it is displaced. This rings further true when those U.S. defendants provide, as they do here, FAC ¶ 7, other extensive U.S.-based support, including ongoing service, custom-design, lobbying, training, maintenance, testing, upgrades, and other activity necessarily occurring in the U.S. and directly facilitating violations of the law of nations. Defendants' generated billions of dollars in profits from its U.S. headquarters as a result of the tortious activity alleged, *id*. ¶ 104. The U.S. Congress sought extensive testimony from Defendants on the tortious conduct detailed in the Complaint. *Id*. ¶¶ 104, 108. The connection between CISCO's U.S. office and the heinous conduct, and indeed the joint venture and conspiratorial actions between the CCP and CISCO, is further exemplified through the interrogation of a Plaintiff on the basis of his availment of the U.S. judicial system for the conduct of a U.S. national. *See* Affidavit of Daniel S. Ward (ECF 24-3) ("DSW Affidavit"). Defendants' U.S. conduct has an overwhelming nexus with U.S. territory.

Defendants' U.S.-based conduct is sufficient to constitute actionable ATS claims. Defendants' corporate structure and chain-of-command, *id*. ¶ 81, and their activity in the United States, *infra* II(A)(1), reflect that Defendants purposefully entered into their conspiratorial agreements and their JCE from the U.S. and purposefully and substantially facilitated law of nations violations from the U.S. *Kiobel* does not require, as Defendants contend, *d.mem*. at 18-19, that law of nations violation occurred in the U.S. As detailed *supra*, this position only garnered two votes from the Supreme Court, the majority did not accept it, and it does not reconcile with the logic of the majority or the principles behind the PAE. *Preliminary Statement, supra*. Defendants' position conflates the inquiry into whether the PAE applies with the inquiry as to whether the PAE is displaced. *Id*. Defendants' analysis does not reconcile with the logic or holding

15

of the majority, was not supported by seven Supreme Court justices, and is *in apropos* when applied to a "strictly jurisdictional" statute.[2] *Sosa*, 542 U.S. at 713.

Defendants misinterpret post-*Kiobel* ATS jurisprudence. *D.Mem*. at 14-16. Defendants also rely on nonbinding and unpersuasive decisions. None of the cases Defendants cite as "considering similar ATS allegations," *id*. at 14, involved U.S. defendants. None of Defendants' cases involve direct orchestration of and ongoing support for tortious conduct from the U.S. None of these cases involved conduct generating billions of dollars of profit in the U.S., lobbying activities in the U.S., extensive testimony before the U.S. Congress, or any of Defendants' other relevant connections to the U.S. detailed in the FAC and *supra*.

Defendants rely, *d.mem*. at 14, on *Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir., 2011) (en banc), *cert. granted and judgment vacated*, No. 11-649, 2013 WL 1704704 (U.S. Apr. 22, 2013), *affirming dismissal on remand*, No. 02-56256, 2013 WL 3357740 (9th Cir. Jun. 28, 2013). The *Rio Tinto* defendants were British and Australian corporations, neither with a principal place of business in the United States, unlike the U.S. Defendants here. *Id*. The plaintiffs' claims arose from activities occurring *exclusively* in Papua New Guinea with no U.S.-relation, unlike conduct at issue here. *Id*. Defendants' nationality and Defendants' conduct in the United States are critical inquiries under *Kiobel*.

Defendants' reliance on *Mohammadi v. Islamic Republic of Iran*, CIV.A. 09-1289 BAH, 2013 WL 2370594 (D.D.C. May 31, 2013) and *Fotso v. Republic of Cameroon*, No. 12-cv-1415-TC, 2013 WL 3006338 (D. Or. Jun. 11, 2013), is similarly deficient. In *Fotso*, "all the activity forming the basis of each claim occurred in Cameroon," and the defendants consisted of the Republic of Cameroon, the President of Cameroon, and Cameroonian officials. *Id*. at *4. Those defendants' nationality and U.S.-conduct

---

[2] The Supreme Court has confirmed that the focus of congressional concern when enacting the ATS was "strictly jurisdictional" (and not, as Defendants contend, on the underlying law of nations violations themselves) by recognizing that the ATS is found in the Judiciary Act of 1789, a statute "*exclusively concerned with federal-court jurisdiction.*" *Sosa*, 542 U.S. at 713 (emphasis added).

represented a factual scenario far removed from those at hand here. The *Mohammadi* defendants included the Islamic Republic of Iran, the Iranian President, and Ayatollah Khomeini, the Supreme Leader of Iran, 2013 WL 2370594. The allegations arose out of "conduct that occurred entirely within the sovereign territory" of Iran, *id*. at *15, which did not remotely bear the "nexus" to U.S. "territory or interests" that the present case bears. *Id*. Neither case had the U.S.-based activity or Defendants here. To determine the degree to which an ATS claim "touches and concerns" the U.S., Defendants' rely on these cases to equate CISCO and CHAMBERS, two U.S. defendants, with, e.g., the Ayatollah or the President of Cameroon. *Mohammadi*, 2013 WL 2370594*; Fotso*, 2013 WL 3006338. Defendants' attempt to equate the extensive direction, ratification, orchestration, support, and other activities they undertook in the U.S. to facilitate tortious conduct with claims based on conduct with no such U.S. nexus.

Contrary to Defendants' reading, *Mohammadi* endorses the availability of Plaintiffs' ATS claim in its reliance on *Mwani v. bin Laden*, No. 99-125, 2013 WL 2325166 at *3-4 (D.D.C. May 29, 2013). 2013 WL 2370594 at FN. 21. In *Mwani*, the District Court held that when, among other things, the relevant conduct is "plotted in part in the United States," 2013 WL 2325166 at *4, the plaintiffs' ATS claims "surely" fit the Supreme Court's "framework of touching and concerning the United States with sufficient force" to displace the PAE. Here, as in *Mwani*, 2013 WL 2325166, (favorably cited by *Mohammadi*, 2013 WL 2370594), Defendants' conduct touches and concerns U.S. territory. Defendants' relevant decision-making, conception, and orchestration of tortious activity came from the United States.

Defendants also rely on *Al Shimari v. CACI Intern., Inc*., No. 08-cv-827(GBL), 2013 WL 3229720 (E.D. Va. Jun. 25, 2013), calling it "especially instructive." *D.Mem*. at 15. Defendants offer no reason why this case is "especially instructive," and that mischaracterization cannot stand scrutiny. Defendants support their incorrect construction of the facts in the FAC and incorrect interpretation of *Kiobel* with an

incorrect assertion that dismissal would "be in keeping with the decisions of every court considering similar ATS allegations since *Kiobel*." *Id*. at 14. The opinion that Defendants later cite as "especially instructive," *id*., reaches a conclusion that no other court has ever reached. 2013 WL 3229720. Defendants are asking this Court to simultaneously value the consensus of other courts while holding "especially instructive" an opinion diverging sharply from those and every other ATS holding.

*Shimari* is not instructive. The *Shimari* Court held that the plaintiffs' ATS claims were deficient because plaintiffs did "not allege that any violations occurred in the United States or any of its territories." *Id*. at *7. As discussed *supra*, seven Supreme Court Justices specifically did not espouse this interpretation, and it is not reconcilable with the *Kiobel* majority. The *Shimari* Court dismissed *Kiobel*'s careful "touch and concern" language as "textually curious." *Id*. at 9. This court should not deem 'instructive' a decision standing alone in its interpretation, espousing a view that *Kiobel* rejected.

Defendants are U.S. nationals whose domestic conduct is both highly relevant to and itself sufficient to give rise to the law of nations violations detailed in the FAC. This is the type of ATS claim the Supreme Court exercised explicit caution to not foreclose. It cannot be dismissed by a "straightforward" application of *Kiobel*. *D.Mem*. at 14. Indeed, it is not dismissed by even the most restrictive reading of *Kiobel*, which Defendants support, *id*. at 18-19, (but not supported by seven Supreme Court Justices). The PAE does not apply because: A. The actions comprising aiding and abetting, conspiracy, and JCE liability occurred in the United States; B. Defendants orchestrated the relevant conduct from the United States; C. Defendants are U.S. nationals; and D. Plaintiffs' claims "touch and concern" U.S. territory with "sufficient force" to displace the PAE. *Kiobel* 133 S.Ct at 1669.

18

**B.  The FAC Adequately Alleges the Requisite *Mens Rea* and *Actus Reus* for ATS Claims**

**1.  Defendants' Purposefully and Substantially Facilitated Law of Nations Violations**

Defendants, relying on *Aziz v. Alcolac*, 658 F.3d 388 (4th Cir. 2011), argue "the FAC alleges no

facts to suggest that Defendants acted with the purpose to facilitate a specific international law violation."

The *Aziz* Court found that Plaintiffs had not sufficiently alleged that the defendant acted with "the purpose

of facilitating the alleged violation," where, without "any supporting facts," the

> sole reference to Alcolac's intentional conduct in the Amended Complaint is an allegation
> that Alcolac placed [a chemical] "into the stream of international commerce with the
> purpose of facilitating the use of said chemicals in the manufacture of chemical weapons
> to be used, among other things, against the Kurdish population in northern Iraq."

*Id*. at 401. Here, in stark contrast, the FAC demonstrates Defendants' specific intention to facilitate the

crimes against humanity, torture, and other grave violations of international law. The FAC details how

Defendants, in their own words, marketed CISCO technology specifically for the purpose of fulfilling the

CCP's aim to *douzheng* dissidents such as Plaintiffs. FAC ¶¶ 74, 86, 98, 111. Defendants demonstrated

specifically how CISCO technology could be used to eradicate dissidents. *Id*. ¶ 84. Defendants repeatedly

advertised CISCO products directly to CCP officials for the specific purpose of facilitating those officials'

undisputed goal to eradicate dissidents in the specific manner detailed in the FAC. *Id*. ¶ 85. Defendants

acknowledged that the purpose of its project was to eradicate dissidents, and acknowledged that this

venture was lucrative. *Id*. ¶ 87. Defendants, fully cognizant of the Golden Shield's unlawful purpose, and

having marketed CISCO technology to facilitate that purpose, provided training on the use of CISCO

technology for that unlawful purpose, customized the technology for that purpose, and provided ongoing

support to facilitate that purpose. *Id*. ¶¶ 63, 76, 88.

The *Aziz* defendant delivered a chemical to a New York company, which transshipped the chemical

through a Swiss company. 656 F.3d at 691. That defendant did not specifically design and directly market

19

the chemical to Saddam Hussein for the purpose of creating mustard gas to use on the Kurdish population in Northern Iraq, nor did that defendant create the mustard gas used against the Kurdish population. 658 F.3d 388. Conversely, Defendants undertook the exact analog to those actions. The *Aziz* plaintiffs did not allege that *Alcolac* sold a product specifically designed for Saddam Hussein, but rather that the chemical could be sold to any bidder. *Id*. The FAC alleges that Defendants created/modified CISCO technology for the express purpose of helping the CCP eradicate dissidents. FAC ¶¶ 70-71, 76, 83, 87, 98, 114. Defendants worked directly with the CCP to customize CISCO technology and facilitate the use of that technology for the specific purpose of eradicating dissidents (such as Plaintiffs). *Id*. ¶¶ 30, 60-63, 71, 83, 87. Defendants repeatedly marketed CISCO products to the CCP for this specific purpose. *Id*. ¶ 87. Defendants described this specific activity as lucrative. *Id*. ¶¶ 84, 96, 96-98. Defendants offered ongoing, active, and direct support and training for that purpose. *Id*. ¶ 27. Defendants ordered and exercised ongoing control over their activity that facilitated the tortious conduct, *id*. ¶¶ 57, 61-63, 76, 87, demonstrating their purpose to facilitate these abuses. *See, e.g,. Yusuf v. Samantar*, No. 1:04-CV-1360, 2012 WL 3730617 (E.D. Va. Aug. 28, 2012 (Defendant acted with "purpose of facilitating" specific acts where defendant ordered, exercised control, and permitted general human rights abuses)).

Defendants' reliance*, d.mem*. at 21, on *Liu Bo Shan v. China Const. Bank Corp*., 421 F.App'x 89 (2d Cir. 2011) is not persuasive. In *Liu*, the Second Circuit found that the complaint did not adequately allege a purpose of facilitating law of nations violations where plaintiffs alleged that the defendant acted with the "purpose of preventing him from exposing illegal activities," but acted only with "knowledge of certain mistreatment" at the hands of foreign authorities. *Id*. at 94. Here, CISCO and CHAMBERS' purpose was to facilitate the persecution of dissidents, demonstrated through their having specifically

conceived of, designed, marketed, controlled, supported, and orchestrated decisions essential to the technology apparatus created for and central to the violations of the law of nations. FAC ¶¶ 70-98, 114.

The Fourth Circuit in *Aziz*, 658 F.3d 388, derived the purpose standard for ATS aiding and abetting liability from the Second Circuit's decision in *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 259 (2d Cir. 2009). The *Talisman* Court held that the plaintiffs' claims failed because the plaintiffs did not demonstrate that the defendant "acted with the purpose to support the [Sudanese] Governments' offenses." *Id*. at 263. The FAC alleges that Defendants acted with the purpose to support the offenses described in the FAC, evidenced by their marketing CISCO technology to, and working directly with, CCP officials on an ongoing basis to create/enhance a system of repression to detain, torture, and suppress dissidents. The *Talisman* court held that such claims can survive if "a genuine issue of fact as to a defendant's intent to aid and abet the principal could be inferred." *Id*. at 264. This Court can at the very least infer a genuine issue of fact as to Defendants' intent to aid and abet. The facts in the FAC, "entitled to the assumption of truth," *Iqbal*, 566 U.S. at 680, demonstrate that Defendants had requisite *mens rea* for aiding and abetting liability.

Defendants contend that the FAC fails to allege that "CISCO or its officers substantially facilitated the . . . torture, detention, or other law of nations violations." *D.Mem*. at 22. As detailed in the factual background, *supra*, Defendants' conduct substantially facilitated these violations. Prior to Defendants' creation of the Golden Shield, the CCP did not have the ability to comprehensively monitor and track 460 million-plus internet users and detain dissidents on the basis of their internet activity. FAC ¶ 106. In fact, on the basis of Defendants' specific and detailed advertising that they could facilitate the repression of dissidents, the CCP chose to enter its agreement with Defendants. *Id*. ¶ 102. Defendants constructed the first level network of the project. *Id*. ¶ 103. Defendants offered training and ongoing customization,

support, and maintenance. *See, e.g., id.* ¶¶ 56, 63, 69, 77, 83, 88. Defendants provided the backbone of the

Golden Shield. *Id.* ¶¶ 52-54, 57. Plaintiffs' punishment was on the basis of the specific activity that CISCO

designed, sold, and supported its technology to help *douzheng*. *See, e.g, id.* ¶¶ 74-79. Plaintiffs were

informed that their torture was on the basis of internet activity tracked by the Golden Shield. *Id.* ¶¶ 139,

159. Plaintiffs were tortured and otherwise subjected to gross violations of their basic human rights on the

basis of anonymous web postings, *id.* ¶¶ 116, 162, and on the basis of unsent (and otherwise untraceable)

emails. *Id.* ¶¶ 65-68. Amongst hundreds of millions of active internet users, Plaintiffs' activity could not

feasibly have been detected (nor collected, scanned, and cataloged, *id.* ¶ 68) in the breadth or manner in

which it was without Defendant's substantial actions. *Id.* ¶ 65-68. Defendants' technology was used in

precisely the method it was designed to be used, and for the specific purpose Defendants designed it.

### 2. Defendants Are Liable Under Aiding and Abetting, Conspiracy, and Joint Criminal Enterprise Modes of Liability and Misstate the Appropriate *Mens Rea* Standards.

The *Talisman* holding, on which Defendants heavily rely, *d.mem.* at 22, relied, as did *Aziz*, 658

F.3d 388, on Judge Katzmann's concurrence in *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 276

(2d Cir. 2007) *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008). *Talisman*, 582

F.3d at 258-259; *Aziz*, 658 F.3d at 396. That concurrence stated that the *mens rea* for aiding and abetting

liability under international law was whether a defendant acted "for the purpose of facilitating the

commission of such a crime." *Khulamani*, 504 F.3d at 259 (Katzmann, J., concurring). That opinion

specified that this standard *did not apply* to "assistance rendered to the commission of a crime by a group

of persons acting with a common purpose," to which a knowledge standard applies instead. *Id.*

Defendants' facilitation of a group of persons with common purpose is within the category of claims to

which, under the rationale of *Aziz, Khulamani*, and *Talisman*, the "purpose" standard does not apply.

The *Aziz* Court, in determining that the purpose standard applied to aiding and abetting claims, also found persuasive Judge Katmann's opinion in *Khulamani* and the analysis in *Talisman* that aiding and abetting liability in international law had been at times inconsistently applied by international tribunals and thus a "knowledge" requirement for aiding and abetting was not "sufficiently well-established." *Id*. at 397. The *Aziz* Court *did not rely* on any such analysis as related to conspiracy or JCE claims and *did not find* that the knowledge component for conspiratorial or JCE liability was insufficiently established in international law. *Id*. The *Aziz* Court also *did not hold* that a uniform *mens rea* standard applies to aiding and abetting, conspiracy, and JCE liability under the ATS.

Indeed, the *Aziz* Court found the Rome Statute for the International Criminal Court ("Rome Statute"), on which Judge Katzmann also heavily relied in *Khulamani*, 504 F.3d at 276, to be persuasive, as it "hews as closely as possible" to the Supreme Court's guidance in *Sosa*, 542 U.S. at 725. *Id*. at 400-401. This Court should follow the Fourth Circuit's guidance and turn to the Rome Statute for the appropriate *mens rea* standard for JCE and conspiracy liability under the ATS, and to interpret the scope of the "purpose" standard applicable to aiding and abetting claims under the ATS.

The Rome Statute provides:

1.   Unless otherwise provided, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court only if the material elements are committed with intent and knowledge.

2.   For the purposes of this article, a person has intent where:
     (a)   In relation to conduct, *that person means to engage in the conduct*;
     (b)   In relation to a consequence, that person *means to cause that consequence or is aware that it will occur in the ordinary course of events*.

3.   For the purposes of this article, "knowledge" means awareness that a circumstance exists or a consequence will occur in the ordinary course of events. "Know" and "knowingly" shall be construed accordingly.

23

*Rome Statute*, Art. 30 ("Mental Element") (emphasis added). The Rome Statute and international jurisprudence makes clear that the *mens rea* standard for international crimes is met where a defendant has knowledge that "a circumstance exists," intent to "engage in the conduct," and is aware that the "consequence will occur in the ordinary course of events." *Id*. Under *Aziz's* rationale and controlling factors, the "purpose" standard for aiding and abetting under the ATS should be read in conjunction with the words of the Rome Statute that the Fourth Circuit endorses as the primary source of that standard. Defendants knew the circumstances of their actions, intended to engage in actions to support tortious conduct, and the tortious conduct occurred in the natural course of events following Defendants actions. FAC ¶¶ 28, 31-36, 39-45, 60-64, 67-79, 83-87, 102, 111-115. Under persuasive international authority, Defendants acted with the requisite *mens rea*.

The Court should, per *Aziz*, look to the Rome Statute and international law to supply the *mens rea* standard for Plaintiffs' conspiracy and JCE claims. 658 U.S. at 400-401. Under the straightforward application of the Rome Statute's language, Defendants' conduct violates the law of nations. Defendants do not dispute the forms of conspiratorial or JCE liability under international law. Defendants' only discussion of conspiratorial liability wrongly conflates conspiracy as a mode of liability with conspiracy as a completed offense, and incorrectly equates two separate and distinct modes of liability under international law. *D.Mem*. at 22. This Court has previously (and correctly) held that JCE liability and conspiratorial liability are distinct. *See Lizarbe v. Rondon*, 642 F.Supp.2d 473, 490 (D. Md. 2009). Conspiratorial liability under the ATS should derive from the *mens rea* standards embodied in international law and in the Rome Statute. *Aziz*, 658 F.3d at 400-401. This *mens rea* standard, explained *supra*, establishes Defendants' liability for its numerous agreements to facilitate the tortious activity detailed herein. *See, e.g.*, FAC ¶¶ 56, 64, 69, 71, 77.

International law endorses JCE liability.[3] The FAC lays out the undisputed three internationally recognized forms of JCEs and Defendants' participation in them. FAC ¶¶ 163-179. International jurisprudence also clearly lays out these three modes of JCE liability.[4] These modes of JCE do not have an identical *mens rea* standard to aiding and abetting claims under international law. *Id*. This Court has stated correctly that JCE liability, distinct from aiding and abetting liability and undisturbed by the *Aziz* holding, applies where "(i) the crime charged was a natural and foreseeable consequence of the execution of [the] enterprise, and (ii) the accused was aware that such a crime was a possible consequence of the execution of [the] enterprise, and, with that awareness, participated in [the] enterprise." *Lizarbe*, 642 F.Supp.2d at 490 (citation omitted). As stated in the FAC, the law of nations violations were a natural and foreseeable consequence of the enterprise, Defendants were aware of this consequence, and Defendants participated in the JCE with that awareness. Defendants significantly participated in and contributed to the JCEs and acted with the requisite *mens rea* under international law.

### C. Corporations Are Liable Under the ATS

*Kiobel* held that "mere corporate presence" was insufficient to sustain ATS liability because "corporations are often present in many countries." 133 S.Ct at 1669. The Supreme Court's careful words would be rendered *non-sequitur* were this Court to espouse Defendants' argument. *D.Mem*. at 24. The Supreme Court's statement that "mere corporate presence" is insufficient to displace the PAE would be meaningless were corporations never liable under the ATS. The Supreme Court, were it to hold that the ATS did not allow for corporate liability, would not have distinguished levels of corporate activity

---

[3] The Rome Statute states that "a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of this Court if that person . . . contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose." Art. 25(3)(d). Under the Statute, the knowledge standard applies to this mode of liability. Rome Statute, Art. 30.

[4] *See*, *e.g*., Prosecutor v. Tadic, Case No. IT-94-1-A, Judgment, ¶ 178 (July 15, 1999).

allowing for ATS liability. Moreover, the Supreme Court, were it to endorse the Second Circuit's holding on corporate liability, would have stated as much in its opinion when considering an ATS claim against a corporation, prior to deciding the case on its merits.[5] However, no Supreme Court Justice took this position. 133 S.Ct 1659. Indeed, the Court's "careful approach," *id*. at 1669 (Kennedy, J., concurring), did not upset the holding of *nearly every Circuit Court* to have considered the issue.[6] The only inference to derive from *Kiobel* is that corporations can be liable under the ATS.

The Second Circuit opinion (on which Defendants rely) dismissed the ATS claim on subject matter jurisdiction grounds. *Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 149 (2d Cir. 2010), *affd. on other grounds,* 133 S.Ct 1659 (2013). However, as detailed in the Preliminary Statement, *supra*, the Supreme Court affirmed dismissal on the claims' merits, not on the basis of subject-matter jurisdiction. *See* 133 S.Ct. 1664 (citing *Morrison*, 130 S. Ct. at 2877 for the proposition that "the question of extraterritorial application" is "a merits question, not a question of jurisdiction.") (internal quotation omitted). Because the Supreme Court decided *Kiobel* on the merits, only two constructions logically follow. Either Defendants' arguments do not raise a question of subject matter jurisdiction (and, regardless, corporate immunity is unsustainable as a merits question), or the Supreme Court, by deciding *Kiobel* on the merits, necessarily found jurisdiction over corporations.[7]

---

[5] As detailed herein, the *Kiobel* and *Morrison* holdings make clear that the PAE is a merits questions.

[6] The D.C., Fifth, Seventh, Ninth, and Eleventh Circuits all speak for corporate liability under ATS. *See Doe v. Exxon Mobil Corp*., 654 F.3d 11 (D.C. Cir. 2011) (vacated on other grounds) 09-7125, (D.C. Cir. July 26, 2013); *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1017 (7th Cir. 2011); *Romero v. Drummond Co., Inc*., 552 F.3d 1303, 1315 (11th Cir. 2008); *Sarei,* 671 F.3d 736 ("No principle of domestic or international law supports the . . . conclusion that the norms enforceable through the ATS . . . apply only to natural persons and not to corporations") (quoting *Kiobel*, 621 F.3d at 153 (Leval, J., concurring)). *See Beanal v. Freeport-McMoran, Inc*., 197 F.3d 161 (5th Cir. 1999) (deciding ATS case against a corporation on the merits, thereby recognizing that ATS jurisdiction existed over a corporation).

[7] *See, e.g., Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, N.6 (D.Md. 2010) *rev'd sub nom. Al-Quraishi v. L-3 Services, Inc*., 657 F.3d 201 (4th Cir. 2011), *dismissed on reh. En banc sub nom. Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205 (4th Cir. 2012) ("[T]hat the appellate court resolved the case [on its merits] suggests that the appellate court assumed that the district court had subject matter jurisdiction").

The Supreme Court's holding in *Sosa*, 542 U.S. 692, confirms this approach. The Supreme Court there held that "federal courts should not recognize private claims under federal common law for *violations of any international law norm* with less definite content and acceptance" in international law "than the historical paradigms familiar when [the ATS] was enacted." *Id*. at 732. *Sosa* does *not* guide federal courts to look to international law to determine *who* is liable. *Id*. Rather, *Sosa* instructed that Courts should derive only the "*violations* of any international law norm" from international law. *Id*. (emphasis added). The violations of international law norms at issue here, including crimes against humanity, torture, cruel, inhumane, and degrading treatment ("CIDT"), and others detailed in the FAC, are well-founded in international law. *See infra* II(D). *Sosa's* guidance is that actionable *conduct* need derive from international law, while the answer to *whom liability attaches* does not derive from international law, since international law leaves this inquiry to the host jurisdiction. 542 U.S. at 732. Defendants' arguments as to whether an international tribunal has previously held a corporation liable are irrelevant to whether Defendants' conduct rose to a "violation" of an international law norm, and this Court should not find persuasive Defendants' conflation of two distinct inquiries – first, who is liable, and second, under *Sosa*, what conduct rises to a "violation" of an "international law norm." *Id*.

The Second Circuit's approach in *Kiobel*, 621 F.3d 111, the sole authority on which Defendants rely, "overlooks the key distinction between norms of conduct and remedies . . . and instead conflates the norms and the rules (the technical accoutrements) for any remedy found in federal common law." *Exxon*, 654 F.3d at 50. The Second Circuits' analysis had "a number of problems" and is unpersuasive.[8] *Id*. There is no reason to believe the Fourth Circuit will follow this problematic and unpersuasive approach, which

---

[8] Defendants offer no reason that the rationale in *Exxon*, 654 F.3d 11, is unpersuasive. In *Exxon*, the D.C. Circuit undertook a detailed analysis of *Sosa* and the passage of the ATS, finding that when the First Congress passed the ATS, "corporate liability in tort was an accepted principle of tort law in the United States." *Id*. at 47. The D.C. Circuit correctly found "a number of

not only ignores the plain text, history, and purpose of the ATS, it rests its conclusion of corporate immunity on a misreading of [a footnote] in *Sosa* while ignoring *Sosa's* conclusion that federal common law would supply the rules regarding remedies, inasmuch as all claims under the ATS are federal common law claims, and also ignoring a source of international law providing for corporate liability in all legal systems.

*Id.* at 54-55 (internal citations omitted). *See also Flomo*, 643 F.3d at 1017 (The Second Circuit's opinion is an "outlier" and the "factual premise of the majority opinion . . . is incorrect" and ignores corporate accountability, including reparations and the asset seizure, deriving from customary international law after World War II). The Second Circuit's "interpretation of international law, which accords to corporations a free pass to act in contravention of international law's norms, conflicts with the humanitarian objectives of that body of law." *Kiobel*, 621 F.3d at 155 (Leval, J., concurring in judgment). There is "broad judicial agreement that the ATS provides for corporate liability." *Al-Quraishi*, 728 F. Supp. 2d at 755. Corporations can be held liable under the ATS.

Defendants' argument that the TVPA displaces the ATS, *d.mem.* at 25, is a nonstarter. The Supreme Court in *Sosa*, 542 U.S. at 731, expliclty characterized the TVPA as "supplementing" and not displacing the ATS, and this is demonstrated in the TVPA's legislative history. *Exxon*, 654 F.3d at 56 ("The House and Senate Committee reports state that [the ATS] has other important uses and should not be replaced by the TVPA")(internal citations omitted). The plain text of the TVPA does not contain any "implicit or explicit repeal" of the ATS. *Enahoro v. Abubakar*, 408 F.3d 877, 886-87 (7th Cir., 2005)(Cudahy, J., dissenting in part). The TVPA neither "occupies the field," nor does it "preclude ATS

---

problems" with the Second Circuit's analysis on which Defendants solely rely. *Id.* at 50. The D.C. Circuit's analysis demonstrates that the Second Circuit overlooked highly relevant international law sources and misinterpreted the creation of customary international law. *Id.* at 51-54. The D.C. Circuit's detailed reading of jurisprudence makes clear that the Second Circuit misinterpreted the Supreme Court's ruling in *Sosa*. *Id.* Further, regardless of whether the answer to *who* is liable under the ATS derives from domestic or international law, numerous international treaties and authorities demonstrate that juridical entities should be liable for international law violations. *Id.* at 47, FN. 35. Accordingly, the *Exxon* rationale is highly persuasive. The D.C. Circuit has recently vacated and remanded this case on other merits-based grounds, but has left undisturbed the rationale as to corporate liability under the ATS.

claims." *D.Mem.* at 25. *See, e.g., Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1251 (11th Cir. 2005)("To accept that the [TVPA] provides the exclusive remedy for acts of torture is to accept that it amends the [ATS]. Such an intent to amend is not apparent from the face of the statute, and amendments by implication are disfavored. Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one.") (internal quotations and citations omitted). *See also Al-Quraishi*, 728 F.Supp.2d at 755 ("even if this Court were to agree that the TVPA only applies to natural persons, that would not affect whether the ATS should apply to corporations"). This Court should deny Defendants' Motion.

### D.  Plaintiffs' ATS Claims Are Supported by Well-Pled Facts that Clearly Demonstrate Defendants' Specific and Definite Violations of International Law

*Crimes Against Humanity.* Crimes against Humanity (CAH) are a subset of crimes, including "imprisonment or other severe deprivation of physical liberty in violation of the fundamental rules of international law," "torture," and "persecution" that are "committed as part of a widespread or systematic attack directed against any civilian population." Rome Statute, Art. 7.[9] Plaintiff's claims satisfy the "widespread or systematic" requirements (the "chapeau" elements) of a CAH. Defendants' contention that Plaintiffs fail to allege "massive" or "large scale action" is incorrect. *D.Mem.* at 27.

Defendants designed the Golden Shield specifically to provide the widespread ability to "monitor every packet of information transmitted through internet gateway routers." FAC *¶ 54*. Defendants' technology "is widely, methodically, and frequently used on a large-scale to detect, track, monitor, suppress, *douzheng*, and torture peaceful political, social, and religious dialogue of dissent," as it is used

---

[9] Defendant's assertion that an "armed conflict" standard may apply to CAH, *d.mem.*, FN. 11, is untenable. CAH under the Rome Statute intentionally requires no nexus to armed conflict, and the Fourth Circuit has stated that the Rome Statute's articulation of elements of *jus cogens* violations "hews as closely as possible" to *Sosa's* requirements, 542 U.S. at 725. *Aziz*, 658 F.3d at 400-401.

to track, in order to persecute, over 460 million internet users. *Id*. ¶ 47. Defendants marketed their technology to combat an "evil religion" and an entire class of political dissidents. *Id*. ¶ 111. Defendants marketed the technology by evoking the extermination of millions of people and specifying that the technology would be used to combat a large class of persons (including political dissidents and an entire religious group), reflecting the widespread nature of their tortious conduct. *Id*. ¶¶ 48, 74. Plaintiffs and their attorneys "have identified hundreds of individuals" that are victims of this widespread action. *Id*. ¶ 25. Plaintiffs have therefore sufficiently alleged widespread perpetration. The number of Plaintiffs in a case, despite Defendants' assertion, *d.mem*. at 27, is not relevant to the inquiry. Defendants can provide no authority demonstrating that a CAH claim must be brought by a large class.

Even without widespread action, a CAH exists where there is systematic action. *See In re Chiquita Brands Int'l, Inc*. *Alien Tort Statute & S'holder Derivative Litig*., 792 F. Supp. 2d 1301, 1335 (S.D. Fla. 2011) ("The widespread or systematic requirement is disjunctive, not cumulative") (internal citations omitted). Defendants' description of the magnitude of the claims detailed in the FAC wrongly conflates the two distinct chapeau elements and does nothing to demonstrate that Defendants' conduct was not systematic. *D.Mem*. at 27. Defendants' argument that the FAC does not "allege individual or class claims on behalf of hundreds of individuals" described in the FAC is irrelevant and incorrect.

The campaign to persecute dissidents meets the *chapeau* requirements. Defendants specifically designed, customized, and marketed the technology, *see supra* II(B), to create a system to *douzheng* and persecute dissidents. "[S]ystematic refers to the organized nature of the acts of violence and the improbability of their random occurrence." *In re Chiquita*, 792 F. Supp. 2d at 1335. The drafters of the Rome Statute made clear that systematic means "pursuant to a preconceived plan or policy." *Report of the International Law Commission*, p. 47, U.N. Doc. A/51/10 (1996). Here, a preconceived plan and policy is

established through the expressed desire to meet stated preconceived and pre-established goals of persecuting dissidents. FAC ¶¶ 60-64, 70-71, 74, 78-79, 83-87. The acts were highly organized, demonstrated through extensive planning undertaken to deploy the Golden Shield to *douzheng* dissidents. *Id*.. The attacks happened through use of CISCO technology. It is implausible that they happened randomly. *Id*.. Defendants created and supported a system linking a person's identity, voice patterns, internet patterns and history, political tendencies, family background, and work history, and making that information immediately accessible to help persecute dissidents. *Id*. ¶ 55. Defendants explicitly stated that the goal was to target disfavored groups. *Id*. ¶ 111. The CCP worked with CISCO on the basis of Defendants ability to provide technology designed for a widespread and systematic crackdown. *Id*. ¶ 103.

Beyond being pursuant to preconceived plan and policy, the technology is systematically used to identify, track, monitor, detain, and persecuted dissidents. *Id*. ¶ 59. Plaintiff Du's activity was systematically monitored using CISCO technology. *Id*. ¶ 123. Plaintiff Zhou's activity was systematically monitored using CISCO technology. *Id*. ¶¶ 135, 139-140, 144. Plaintiff Liu's activity was systematically monitored using CISCO technology. *Id*. ¶¶ 154-157. Defendants created an organized *system* of repression that facilitated widespread and systematic attacks against dissidents including Plaintiffs. *Id*. ¶ 170. These facts reflect a clear *modus operandi* of utilizing CISCO technology to track, monitor, detain, torture, persecute, and otherwise submit dissidents such as Plaintiffs to grave violations of fundamental human rights. The attacks are therefore systematic. Defendants purposefully and substantially facilitated detailed heinous brutalities, and that conduct directly led to the torture, CIDT, persecution, and other grave violations of Plaintiff's basic human rights. *Id*. ¶¶ 70-71, 76, 78, 83, 87, 98, 114. Defendants' assertion that Plaintiffs' claims devalue human rights law, *d.mem*. at 28, is dubious, and itself degrades human rights law through its implication that such centrally-planned brutalities are not CAH.

31

*Torture.* Defendants do not contend that Plaintiffs' severe pain and suffering do not comprise torture. Defendants instead contend that Plaintiffs' severe mental and physical suffering "have arisen in the course of imposition of sanctions lawful under Chinese law." *Id*. Defendants simultaneously state that torture Plaintiffs suffered "is illegal under Chinese law, and no Chinese laws authorize such conduct as a penalty for political speech." *Id*. at 5 (citations omitted). It would be impossible for Plaintiffs' pain and suffering to arise from, be inherent in, or incidental to, the imposition of lawful sanctions, *id*. at 28, when such pain and suffering is wholly distinct from lawful sanctions (let alone expressly prohibited to follow from lawful sanctions). Plaintiffs were not sentenced to torture or CIDT or the other brutalities they suffered, FAC ¶¶ 15-25, 118, 138, 145, so their pain and suffering could not arise from, be incidental to, or inherent in, any sanction. Defendants' apparent position that international law permits any torture, however heinous, if performed by police does not remotely reflect either domestic or international law.

*Cruel, Inhuman, and Degrading Treatment and Punishment.* Defendants recognize the authoritative value of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment [CAT], *d.mem*. FN. 12, a multilateral treaty signed by 153 countries, providing a non-derogable and internationally binding ban on CIDT. *See* Committee Against Torture, General Comment No. 2, ¶ 3, U.N. Doc. CAT/C/GC/2/CRP.1/Rev.4 (Nov. 2007). That the prohibition against CIDT is, as is the prohibition against torture, a non-derogable obligation under international law demonstrates that CIDT does indeed satisfy *Sosa*'s requirements, 542 U.S. at 725, of specificity and acceptance. As this Court has held, "the lens of *Sosa* tends to support . . . that CIDT is among the violations of the law of nations actionable under the ATS," demonstrated further in "international agreements and conventions," U.S. laws "dealing with foreign relations," and "judicial precedent." *Al-Quraishi*, 728 F.Supp.2d at 756-760.

Because Plaintiffs' treatment undisputedly amounted to torture, it rises to the level of CIDT. *Id*. at 759 (CIDT and torture are a "continuum," separated by "degrees of mistreatment") (internal citations omitted).

> ***Forced Labor, Arbitrary Arrest, and Prolonged Detention***. Defendants do not contest that either forced labor or arbitrary arrest and prolonged detention are not ATS-actionable. Defendants contend instead that Plaintiffs' forced labor occurred lawfully and pursuant to lawful imprisonment, *d.mem*. at 29, and that Plaintiffs' arrest and detention was not arbitrary because it was "authorized" under the laws of the jurisdiction where it occurred. *Id*. at 30. Plaintiffs' forced labor occurred devoid of all due process and on the basis of confessions extracted by torture. FAC ¶¶ 15, 18, 21, 25, 118-119, 13-139, 143. Defendants' expert offers that imprisonment on the basis of torture was unlawful, and the forced labor and detention could not have been lawful and pursuant to lawful imprisonment. Declaration of John Chu ¶ 46. Sentencing without due process violates international law, and torture violates basic due process, making subsequent forced labor unlawful. *See, e.g*., International Covenant on Civil and Political Rights, art. 14, Dec. 19, 1966, 999 U.N.T.S. 171; CAT, art. 15, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113. Plaintiffs' forced labor violates international law. Plaintiffs' arbitrary arrest and prolonged detention also violates international law. Again, Defendants' own expert demonstrates that Plaintiffs' administrative detention, which lasted several months, FAC ¶¶ 118, 143, 156, 159, was not authorized under the laws of the jurisdiction where the detention occurred. Declaration of John Chu ¶ 34 ("the maximum term of administrative detention for multiple violations is 20 days.") Plaintiffs' arrests and prolonged detentions were not pursuant to any sanction, and thus those arrests and detentions violate the law of nations.

III.    **PLAINTIFFS' STATE LAW CLAIMS ARE VALID**

**A.  This Court Retains Supplemental Jurisdiction**

Defendants incorrectly assert that this Court should dismiss Plaintiff's state law claims because Plaintiffs do not allege a sufficient amount in controversy. This Court should only dismiss diversity jurisdiction as a basis for jurisdiction "if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). The prayer for actual, compensatory, punitive, and exemplary damages, FAC ¶ 302, establishes that the amount in controversy requirement is met, and certainly does not foreclose diversity jurisdiction. For reasons detailed in Part II, *supra*, this court retains federal jurisdiction. Regardless, the Court is not required to dismiss state-law claims if federal jurisdiction did not exist. *See* 28 U.S.C. § 1367 ("district courts *may* decline to exercise supplemental jurisdiction . . . [if it has] dismissed all claims over which it has original jurisdiction.") (emphasis added). The court has "wide discretion" and should retain supplemental jurisdiction if it "best serves the principles of judicial economy, procedural convenience, fairness to litigants, and comity to the States" underlying the supplemental jurisdiction doctrine. *Carnegie-Mellon Univ. v. Cohill*, 108 S. Ct. 614, 615 (1988). Weighing these factors, given the procedural background and lack of prejudice to Defendants, this court should retain supplemental jurisdiction regardless of whether federal jurisdiction exists (which it does).

**B.  State Tort Law Applies**

For reasons detailed in Part II, *supra*, the FAC does not seek extraterritorial application, given the conduct occurring in the United States. Defendants conflate the extraterritoriality argument with the preemption doctrine. *D.Mem.* at 31-32. As stated in Part V(D) *infra*, the state law claims are not preempted

34

Defendants' authority for the claim that Maryland statutes are categorically barred from applying extraterritorially absent "an express legislative pronouncement" is unconvincing.[10] *D.Mem*. at 32. Defendants further offer no rationale whatsoever for expanding this rule of construction of state statutes to categorically preclude the application of Maryland common law. *Id*. Indeed, the authority which Defendants cite requires <u>no</u> "express legislative pronouncement," nor for every act to have been completed in Maryland, for Maryland common law to apply.[11] *Id*. Defendants provide no tenable basis, nor any persuasive or applicable authority,[12] for any presumption against extraterritorial application to apply to Maryland common law. This Court has previously not dismissed state law claims even where the entirety of conduct occurred in *Iraq*.[13] *Al-Quraishi*, 728 F. Supp. 2d 702. The Fourth Circuit, considering questions of immunity and preemption, has also allowed such state law claims to proceed. *Al Shimari v. CACI Int'l, Inc*., 679 F.3d 205 (4th Cir. 2012). Defendants' domestic conduct, *see* Part II(a), *supra*, far exceeds domestic conduct in state law claims this Court and Circuit have not disallowed.

---

[10] The authority Defendants point to, *d.mem*. at 32, requires no such legislative pronouncement. *In re State of Cal. For L.A. County, Grand Jury Investigation*, 471 A.2d 1141, 1145 (Md. Ct. Spec. App. 1984). The Court there, in its two-sentence analysis, specified that a single statute did not apply extraterritorially because it was "designed" to apply only in this State. *Id*. Such a holding in no way requires an "express legislative pronouncement" for a statute to apply beyond Maryland's borders, cannot be stretched to support Defendants' assertion. Defendants' other authority is similarly unpersuasive.

[11] Defendants rely on a case from the Eastern District of Michigan that explicitly limited its holding to "extraterritorial application of Michigan common law" to "persons beyond its territorial jurisdiction." *Mertik Maxitrol GMBH & Co. KG v. Honeywell Techn. SARL*, No. 10-cv-12257, 2012 WL 748304 at *8 (E.D. Mich. Mar. 6, 2012). Defendants here are well within this Court's territorial jurisdiction.

[12] Defendants rely on a holding that the *lis pendens* doctrine did not apply to property outside Maryland because local rules on *lis pendens* used the word "county" 10 times in four sentences and "county" was defined as "a county of this State." *Permanent Fin. Corp. v. Taro*, 526 A.2d 611, 613 (Md. Ct. Spec. App. 1987). The case in no way supports Defendants' assertion. By searching for express legislative reason to *not* apply a doctrine outside Maryland, the case in fact completely contradicts defendants' assertion. *Id*.

[13] Further, if this court were to find that Chinese law applied under the *lex loci delicti* rule, it should apply Maryland or California law to the extent that the application of Chinese law here would violate public policy. *Lab Corp. of Am. v. Hood*, 911 A.2d 841, 848-851 (Md. 2006).

California common law also applies. Defendants' reliance, *d.mem*. at 33, on *Blazevska v. Raytheon Aircraft Co*., 522 F.3d 948 (9th Cir. 2008) is unavailing[14] as the FAC requires application of common law, not a statute. Defendants offer no rationale to extend any "presumption" to common law claims.[15] *D.Mem*. at 32-33. The conduct at issue is sufficient to defeat any such presumption even if it applied. Defendants operated out of California, and had agents routinely travel to California to facilitate the tortious conduct. FAC ¶¶ 26-43. CISCO's structure necessarily required the relevant conduct come from California. *Id*. ¶ 81. This conduct, either occurring in or directed from California, included conception, design, marketing, ongoing support, ratification, and other activity, *id*. ¶ 26, 81-83, which, as detailed in Part II(A), *supra*, itself violated the law of nations and state law. It resulted in billions of dollars for a California company. *Id*. ¶ 104. This conduct was not merely "preparatory or incidental" but instead essential to the tortious conduct. *D.Mem*., FN.33 (citing *Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-cv-1446, 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010).[16]

---

[14] The Ninth Circuit opinion is, however, instructive because it articulates the failure in logic that Defendants espouse in their conception of the purview of "extraterritorial conduct."

> Simply because a case's factual background involves some conduct occurring abroad does not mean that every Statute governing the matter is subject to [the PAE]: a court must first inquire into whether applying a statute implicates any issues of extraterritoriality . . . Appellants contend that the conduct at issue in this case is a tort injury suffered in Macedonia. Under their logic, the place where the tort claim arises determines whether the various federal statutes governing a case are being applied extraterritorially. Appellants' reasoning oversimplifies the analysis . . . [The PAE] simply is not implicated.

*Blazevska*, 522 F.3d at 952-954 (internal citations omitted).

[15] Defendants' authority provides no inference for a presumption against Plaintiff' claims. Their authority relates only to the scope of legislative acts, and makes clear that, as here, actions undertaken domestically with resulting injuries in another territory are *not* extraterritorial. *See, e.g., Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059-60, 968 P.2d 539, 554 (1999) ("Product liability actions against California manufacturers by persons injured elsewhere by a defective product manufactured in California are *a prime example* of actions" to which the PAE does not apply.) (emphasis added).

[16] This "preparatory or incidental" language originates from a case finding U.S. conduct incidental where the only U.S. connection was a letter sent from Guam. *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535 (9th Cir. 1994). Defendants' U.S. conduct clearly exceeds having only sent a letter. *See* Part II(a), *supra*.

Defendants assert that District Courts "routinely" dismiss state-law claims like the ones at issue here, yet can provide only a single inapplicable example. *D.Mem*. at 33. The *In Re Chiquita* court relied on foreign relations law to determine whether state tort law applied. 792 F. Supp. 2d at 1355. As detailed in the Preliminary Statement, *supra*, the application of foreign relations law, as demonstrated by the four Justices that considered it in *Kiobel*, would find jurisdiction here because of Defendants' nationality (let alone distinct U.S. interests and U.S. conduct). *See Kiobel*, 133 S.Ct. 1664 (Breyer, J., concurring). The facts in *In Re Chiquita* did not implicate domestic conduct to the degree the FAC does. Dismissal of the common law claims is unwarranted.

Defendants' "prudential standing" argument is also unavailing. *D.Mem*. at 33. Defendants provide no basis for the assertion, let alone any analysis, precedent, or rationale, to guide this Court to find that the conduct at issue lies outside any "zone of interests." *Id*. at 34. There is no justification for the claim that the tort claims here do not apply simply on the basis of where injuries occurred.

### C.  The State Law Claims Sufficiently Allege Aiding and Abetting / Conspiracy Liability

Defendants' argument against aiding and abetting and conspiratorial liability is meritless. In Maryland, "[a] person may be held liable as a principal . . . if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Duke v. Feldman*, 226 A.2d 345, 347 (1967). "The legal definition of the word 'aider' is not different from its meaning in common parlance. It means to assist, support or supplement the efforts of another. The word 'abettor' means in law one who instigates, advises or encourages the commission of a crime." *Seward v. State*, 208 Md. 341, 346, 118 A.2d 505, 507 (1955). In California, aiding and abetting liability exists where a defendant "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a

tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 846 (1994). Defendants not only knew of but intended to facilitate the heinous conduct detailed in the FAC. *See* Part II(b), *supra*. Defendants offered extensive assistance and support, including ongoing support, customization, and training, to facilitate this conduct. FAC ¶¶ 61-64, 77. The substantial assistance is reflected in Defendants marketing themselves to specifically render support that led to Plaintiffs' injuries, *id*. ¶ 78-79, that the CCP chose to work with Defendants because of this level of support, *id*. ¶ 102, and that the tortious conduct was not possible absent Defendants' conduct. *Id.* ¶¶ 62, 68. *See* Part II(b), *supra*.

In California, "the elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Mox, Inc., v. Woods*, 202 Cal. 675, 677 (1927). "A complaint is sufficient if it apprises the defendant of the character and type of facts and circumstances upon which she was relying to establish the conspiracy." *Arei II Cases*, 157 Cal. Rptr. 3d 368, 383 (2013) (internal citations and quotations omitted). In Maryland "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Washington Suburban Sanitary Comm'n*, 269 A.2d 815, 824 (1970). The FAC demonstrates extensive agreements evincing a common design, as well as substantial acts in furtherance of that design, between Defendants and the CCP. This extensive agreement and common design is evidenced by, e.g., the ongoing support Defendants provided, *id*. ¶ 61-63, CISCO's public statements that it was working in "full collaboration" to construct the Golden Shield, *id*. ¶ 69, Defendants' expressed interest in meeting a specific goal to *douzheng* dissidents, *id*. ¶¶ 47, 74, 79, and complimentary roles

played by Defendants and the CCP to further the tortious conduct. *Id*. ¶¶ 75-79. *See also* Part II(B), *supra*. It is hard to conceive of a way Defendants could have provided and supported their technology to CCP for the expressed purpose of helping the CCP *douzheng* dissidents *without* entering into agreements. The harms Plaintiffs suffered are directly linked to Defendants' agreement to further the persecution. *Id*. Further, that Plaintiff Du was interrogated specifically in connection with the filing of a lawsuit against CISCO demonstrates the ongoing connections amongst the parties. DSW Affidavit ¶¶ 3-10. Accordingly, Plaintiffs sufficiently plead aiding and abetting and conspiratorial liability under state law.

**D.  The FAC Sufficiently Alleges Causation**

Defendants argue that the CCP's actions were the "moving and effective cause of the alleged injuries," and thus Defendants' actions were not a "but for" or "proximate" cause of Plaintiffs' injuries. *D.Mem*. at 36. The authority from which Defendants derive their language betrays them. In *Hartford Ins. Co. v. Manor Inn of Bethesda*, the Court focused on "the importance of foreseeability in determining the existence of proximate cause." 642 A.2d 219, 230 (Md. 1994). The *Hartford Ins*. Court confirmed that "if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss." *Id*. at 231 (internal citation and quotation marks omitted). A "defendant is liable where the intervening causes, acts, or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act, or omission, or even . . . if the intervening acts or conditions were of a nature, the happening of which was reasonably to have been anticipated. . ." *Id*. at 230-231 (citation and quotation marks omitted). If the harm was reasonably foreseeable, that another party inflicted the harm does not break the causal link. *Id*.

The FAC lays out the foreseeability that Defendants' technology and support would harm Plaintiffs. FAC ¶¶ 69-75. Defendants specifically marketed their products to meet the expressed purpose

to *douzheng* dissidents such as Plaintiffs. *Id*. ¶¶ 47, 74, 79. Defendants conducted extensive diligence on potential uses of their technology, revealing that the harms were certain to occur. *Id*. ¶¶ 69-75. Defendants acknowledged the heinous activity as the basis of the venture. *Id*. ¶¶ 86-87. Defendants continued aiding the crackdown despite CISCO's shareholders' protests that CISCO facilitated grave human rights abuses, and despite extensive reporting on this activity. *Id*. Defendants continued to exercise control over their technology and services, *id*. ¶¶ 27, 30, 34, 38, 42-43, 62-64, 76, 88, and were a "moving and effective cause" of the injury. *Hartford Ins*. *Co*., 642 A.2d at 229-230. As explained in Part II(B), *supra*, Defendants' actions are caused Plaintiffs' injuries. In a sea of over 460 million internet users, it was not possible without CISCO's technology to have instantaneously monitored and tracked Plaintiffs' online activity, particularly their concealed activity and unsent emails that formed the basis of their persecution. *See* Part II(b), *supra*. The conduct forming the basis of their persecution could not have been traced without Defendants' comprehensive technology, training, and support, provided with the express purpose to help persecute dissidents. *Id*.

**E. The FAC States Claims for Infliction of Emotional Distress and Negligent Entrustment.**

*Intentional Infliction of Emotional Distress*. Defendants do not contest that Plaintiffs suffered severe emotional distress, and as detailed *supra*, Defendants' conduct is causally connected to this distress. Defendants contend that the FAC does not establish that the Defendants acted intentionally, with knowledge that emotional distress was a certain consequence of their actions, or recklessly in regards to the infliction of emotional distress. *D.Mem*. at 37. Defendants also contend that their conduct was not "extreme or outrageous." *Id*. at 38. Defendants provide no justification for either argument. Defendants chose to facilitate the nationwide violent persecution of peaceful dissidents, their intention to do so reflected, e.g., through their purposeful use of a term (*douzheng*) referencing the eradication of millions

40

of people, FAC ¶¶ 48, 70, 74, 79, 87, and the acknowledgement that the persecution was lucrative. *Id.* at 87. Defendants' purposeful conduct, detailed *supra*, was intentional, reckless, extreme, and outrageous. Defendants knew or should have known that by supplying technology specifically to facilitate persecution and torture, that those people who were then persecuted and tortured via that technology would suffer severe mental and emotional anguish. It is difficult to conceive of conduct more outrageous than creating and enhancing a system of repression for the purpose of helping persecute and torture peaceful dissidents.

*Negligent Infliction of Emotional Distress*. California law allows Plaintiffs to recover under a negligent infliction of emotional distress. The claim "is not an independent tort but the tort of negligence." *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1377 (2010). California courts have made clear that, because a claim for negligent infliction of emotional distress is a claim for negligence, the claim should be dismissed if Plaintiffs allege a separate cause of action for negligence. *See, e.g.*, *Reedy v. Precyse Solutions LLC*, 1:12-CV-02061-AWI, 2013 WL 1563254 at *14 (E.D. Cal. Apr. 12, 2013); *Sullivan v. City of San Rafael*, C 12-1922 MEJ, 2013 WL 3357933 at *13 (N.D. Cal. July 2, 2013). Plaintiffs do not bring a separate claim for negligence, and the Supreme Court of California has made clear that Plaintiffs can bring a claim for emotional distress under the application of negligence elements. *Wong*, 189 Cal. App. 4th at 1377.

*Negligent Entrustment*. In Maryland, negligent entrustment is defined as "(1) [t]he making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) the supplier should expect to be endangered by its use." *Schramm v. Foster*, 341 F. Supp. 2d 536, 546-47 (D. Md. 2004) (internal citations and quotation marks omitted). "In order to be considered a 'supplier' of chattel, one must have the right to control the chattel." *Id.* at 547. In California, the "sellers of chattels" such as CISCO "may be liable as suppliers of chattels." *Jacoves v. United Merch. Corp.*, 9 Cal. App. 4th 88, 115 (1992) (internal citations omitted).

Defendants contend that they did not exercise control over their technology, that the Golden Shield did not inflict injury, and that any injury was not foreseeable. *D.Mem*. at 38-39.

Despite Defendants' assertions, *id. at 39,* to sustain a negligent entrustment claim Plaintiffs need not demonstrate that Defendants exercised control over CCP officials.[17] Further, as detailed *supra*, the Golden Shield was the essential means through which Plaintiffs suffered their injury because the injuries were on the basis of activity that could not have been otherwise monitored and tracked absent CISCO technology and services. The foreseeability of this use of the technology is apparent, evidenced by Defendants expressly marketing their technology for this purpose, acknowledging that this was a lucrative opportunity, providing ongoing support despite awareness of this use, and expending considerable resources to learn about the opportunity. FAC ¶¶ 26-43, 69-75. Defendants controlled their technology, demonstrated through ongoing support, updates, hardware and software provisions, and active ongoing enhancement of the Golden Shield, FAC ¶¶ 27, 30, 34, 38, 42-43, 62-64, 76, 88, while such injuries were occurring. *Id*. ¶¶ 15-25. Defendants continued providing technology they controlled even as it was used to inflict harm on an ongoing basis. *Id*. ¶¶ *75-76*. Defendants controlled the ability to market, customize, supply, install, enhance, and support the technology, meeting the 12(b)(6) standard. Negligent entrustment claims have been brought for the supply of a multitude of chattel, and the claim has been previously brought in other cases where, despite a far more attenuated causal chain, Plaintiffs alleged law of nations violations. *Corrie v. Caterpillar, Inc*., 503 F.3d 974, 979 (9th Cir. 2007) (dism. on other grounds).

---

[17] Defendants can cite <u>no</u> authority that a negligent entrustment claim requires plaintiffs to exercise control over the entrustee, yet this is the crux of their argument. *D.Mem*. at 39.

IV.     **PLAINTIFFS' CLAIMS AGAINST JOHN CHAMBERS ARE VALID**

   **A.  This Court has Personal Jurisdiction Over Chambers.**

   A federal court "has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (internal citation and quotation omitted). "Maryland courts have personal jurisdiction over any defendant 'who directly or by an agent ... transacts any business or performs any character of work or service in the State.'" *Id.* (citation omitted). To exercise personal jurisdiction, "due process requires that the defendant has at least minimum contacts with Maryland such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (quotation marks omitted). Physical presence is not required to establish personal jurisdiction over a non-resident defendant. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985).

   CHAMBERS is the long-term Chairman and CEO of CISCO, FAC ¶ 41, a corporation with a "substantial, ongoing business presence in this District." *Id.* ¶ 26. Defendants repeatedly attempt to mischaracterize Chambers' role with CISCO, and its operations in this district, by conflating the CEO and Chairman of CISCO with a mere "corporate employee" or "shareholder." *D.Mem.* at 40-41. This is a deceptive attempt to mask CHAMBERS extensive connection with this district, as well as CHAMBERS' intentional availment of this district by virtue of his long-standing leadership and chief decision-making role within a corporation with substantial business in this district (which Defendants do not dispute). CHAMBERS' extensive involvement in CISCO's decision-making is not questioned. Defendants can provide no rationale why CHAMBERS' connection to this forum is not 'plausible.' The distinction between directing and being a mere employee of a corporation is significant. Directing a corporation, even

absent a defendant having visited a district, sufficiently creates personal jurisdiction. *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522 (4th Cir. 1987). CHAMBERS is more than a mere employee. He is both Chairman and CEO, necessarily involved in this high-level decision-making and necessarily connected to this district, with a substantial nexus to this district. FAC ¶ 41. Further, as Defendants do not contest, there is no undue burden on CHAMBERS to litigate this case in Maryland.[18]

**B.  Plaintiffs Assert Valid Claims Against Chambers**

Defendants' entire argument regarding whether Plaintiffs have stated a claim against CHAMBERS is that it is implausible that CHAMBERS, as CEO and Chairman of CISCO at all relevant times, had any direction over CISCO's tortious conduct. *D.Mem.* at 41-43. This argument lacks merit. The FAC alleges that CHAMBERS was inextricably connected to the Golden Shield. CHAMBERS was CEO and Chairman of CISCO at all relevant times. FAC ¶ 41. CHAMBERS traveled to China to promote this activity. *Id.* Persons implementing the Golden Shield traveled to California, where CHAMBERS was based, to further the tortious activity and that CISCO's structure necessarily led CHAMBERS to exercise control over relevant decisions. *Id.* ¶¶ 32, 40-41, 81. CISCO's corporate strategy, doubtlessly guided by its long-term CEO and Chairman, focused since 1994 on expanding business in China. *Id.* ¶ 73. CHAMBERS visited China to promote and sell CISCO products. *Id.* ¶ 41. CHAMBERS would certainly be involved in critical decisions yielding billions of dollars of profit for a company focusing on business in China, *id.* ¶ 104, which led to shareholder protests, domestic lobbying, Congressional inquiries, and widespread reporting and condemnation. *Id.* ¶¶ 75, 104, 108, 109. Given CISCO's structure as well as the value, import, and nature of actions to further the tortious activity, CHAMBERS as CEO and Chairman

---

[18] Even if this Court cannot find that the FAC makes a *prima facie* showing of personal jurisdiction over CHAMBERS, it should grant jurisdictional discovery to further examine the extent his contacts with Maryland. *See, e.g.*, *Am. Ass'n of Blood Banks v. Boston Paternity, LLC*, 2009 WL 2366175 at *12, (D. Md. July 28, 2009) ("jurisdictional discovery would be proper where additional information sought by the plaintiff would alter the analysis of personal jurisdiction") (citation omitted).

controlled the support CISCO provided the CCP on an ongoing basis in the form of training, customization, upgrades, software, and hardware. *See* Part II, *supra*. It is implausible that the CEO and Chairman of CISCO was *not* involved in relevant decision-making.[19]

It is implausible that the conduct at issue could have happened *without* CHAMBERS' participation. The FAC lays out CHAMBERS' connection to a multi-billion dollar project crucial to the company of which he was CEO and Chairman, the decision-making to which necessarily came from his office, leading to, e.g., widespread condemnation, Congressional inquiry, lobbying efforts, shareholder protests, and public corporate statements. Defendants attempt to equate this to, e.g., whether the President of Bolivia had knowledge of violence in his country. *D.Mem*. at 43. There are significant factual details in the FAC creating a "reasonable inference," *Puryear*, 2013 WL 1833262, of CHAMBERS' involvement.

### C. Plaintiffs' TVPA Claims Against Chambers Are Actionable

Defendants offer no justification for their claim that TVPA violations were not committed under "color of law." *D.Mem*. at 43. *Khulamani* (on which the Fourth Circuit relied in *Aziz*, 658 F.3d at 396) explained that in TVPA cases "an individual acts under color of law . . . when he acts together with state officials or with significant state aid." 504 F.3d at 260 (citing *Kadic*, 70 F.3d at 245). The FAC provides extensive factual support showing ongoing interaction and joint actions between state officials and Defendants (necessarily requiring CHAMBERS' extensive participation).[20] *See* Part III(c) *supra*. The authority on which Defendants rely, *d.mem*. FN 22, makes clear that the TVPA claims are actionable.

---

[19] *See also F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (Defendants' "assumption of the role of president of [a corporation] and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation").

[20] As detailed herein, the FAC alleges that CCP officials and Defendants (in actions necessarily controlled and ratified by CHAMBERS, Part IV(b) *supra*) entered into numerous agreements. E.G: Defendants acknowledged working in full collaboration with CCP officials. Defendants marketed technology to meet the goal of CCP officials to *douzheng* plaintiffs. Defendants trained CCP officials. Defendants provided ongoing services. Defendants constructed the network. *Supra*.

*Romero* makes clear that TVPA claims survive if there is "evidence of the active participation of a single official." 552 F.3d at 1317. The FAC lays out the active interactions among Defendants and CCP officials related to torturing political dissidents and demonstrates that this torture was carried out with the active participation of state officials on the basis of information gathered using CISCO technology designed for that purpose. FAC ¶¶ 39-43, 70-71, 76-79. Defendants do not dispute that the FAC alleges that state officials were involved in torture. Defendants' rely on external facts regarding CISCO's general use of intermediaries, neither relevant to conduct detailed in the FAC nor properly considered here. *D.Mem*. FN 23. This reliance on external facts acknowledges the premature nature of Defendants' motion, the importance of obtaining discovery, and demonstrates *precisely* why the Motion must fail.

Defendants offer no reason why aiding and abetting is not actionablee. This Court has held that the TVPA "was intended to reach beyond the person who actually committed the illegal act to those persons to those persons who ordered, assisted or abetted in the violation." *Lizarbe,* 642 F.Supp.2d at 490 (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005). "[N]umerous U.S. and international bodies have recognized causes of action under ATS/TVPA based on theories of conspiracy and aiding and abetting." *Id*. TVPA liability extends to secondary actors.[21] Defendants rely on case law that does not support their proposition, and offer no analysis.[22] CHAMBERS is liable under the TVPA.

## V.   DEFENDANTS' JUSTICIABILITY ARGUMENT IS MERITLESS

### A.  The Political Question Doctrine Does Not Apply to Plaintiffs' Claims

---

[21] *See, e.g*., *Cabello*, 404 F.3d at 1157; *Wiwa v. Royal Dutch Petroleum Co*., 96 CIV. 8386, 2002 WL 319887 at *15 (S.D.N.Y. Feb. 28, 2002) ("[The Senate Committee] explained that the act would permit suits against persons who ordered, abetted, or assisted in torture") (citation and quotation marks omitted).

[22] Once again, Defendants have misinterpreted (or distorted) relevant case law.  *D.Mem*. at 44. *Bowoto*, 621 F.3d 116 (9th Cir. 2010), limited its application of aiding and abetting under the TVPA where Plaintiffs applied the theory to a corporation. The *Bowoto* Courts' entire analysis turned on the application of the TVPA to a corporation, and it in no way whatsoever foreclosed aiding and abetting liability for individuals under the TVPA. *Exxon*, 654 F.3d at 58, is misrepresented in the same manner.

The political question doctrine does not preclude Plaintiffs' claims. The Supreme Court has set forth factors to determine the application of the political question doctrine. *Baker v. Carr*, 369 U.S. 186 (1962). The Defendant "has the burden of establishing the presence of a political question," and "not every case or controversy which touches foreign relations lies beyond judicial cognizance." *Lizarbe*, 642 F.Supp.2d at 487 (citations and quotations omitted). Defendants do not provide any analysis of the *Baker* factors and do not met their burden to establish the application of the political question doctrine.

Defendants cannot show that the doctrine applies.[23] The facts here raise no separation of powers concerns, and certainly none warranting the application of the doctrine. Defendants were not part of the military nor any governmental branch, nor were the actions in any way political. Plaintiffs "do not challenge the constitutionally protected judgments of a political branch, only the decisions and actions of a private corporation and its employee," as such, the doctrine does not apply. *Al-Quraishi*, 728 F.Supp.2d at 731. In enacting the TVPA and the ATS, Congress and the President were surely "mindful of the potential for reciprocal treatment." *Lizarbe*, 642 F.Supp.2d at 487. Trade regulations do not make this Court powerless. "[I]t is clear that not even military judgments are completely immune from judicial review." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007). Here, "[t]he department to whom the issue has been constitutionally committed is none other than . . . the Judiciary." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2nd Cir.1991)(quotation marks omitted). Defendants provide no reason that this case is outside judicial competence, provide *no* application of the *Baker* factors, and cannot show that adjudication upsets separation of powers. Defendants fall far short of their burden.

---

[23] Defendants' case-law is unavailing. For instance, the court in *Corrie* applied the doctrine and expressly stated that "the decisive factor" was that the sales "were paid for by the United States." 503 F.3d at 983. There is *no* such allegation, nor have Defendants identified *any* remotely analogous concern here. There is no political decision-making or involvement in Defendants' expressed decision to facilitate brutalities.

**B.  The Act of State Doctrine Does Not Apply to Plaintiffs' Claims**

Defendants bear the burden to prove that the act of state doctrine applies. *See, e.g.,, Bigio v Coca-Cola Co*., 239 F.3d 440, 453 (2d Cir. 2000); *Alfred Dunhill of London, Inc*. *v*. *Republic of Cuba*, 425 U.S. 682, 694 (1976). Defendants fall far short of meeting this burden. Again, the Supreme Court has laid out factors for this Court to consider. *Banco Nacional de Cuba v*. *Sabbatino*, 376 U.S. 398, 428 (1964). *Again*, Defendants provide no application of any of the relevant factors, and fail to demonstrate the applicability of the doctrine.[24] Defendants cannot show that the case "touch[es] sharply on national nerves" of the United States, nor that the acts of a commercial entity and its CEO and Chairman "represent a sensitive foreign policy issue." *Lizarbe*, 642 F.Supp. at 489. Further, violations of *jus cogens* norms, such as the ones alleged in the FAC, "are not deemed official acts for the purposes of the act of state doctrine," nor is torture or "similar human rights abuses." *Id*. at 488-89. The act of state doctrine does not apply. These actions are not "official" or "public acts" for purposes of the doctrine. *Id*.

"Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *W.S. Kirkpatrick & Co*., *Inc*. *v*. *Environmental Tectonics Corp*., *Intern*., 493 U.S. 400, 409 (1990). "The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id*. As in *W.S. Kirpatrick,* the "doctrine has no application to the present case because the validity of no foreign sovereign act is at issue." *Id*. at 409-140. Adjudication would not "invalidate" any foreign judgment or act. Plaintiffs are "not trying to undo or disregard" foreign government action and the doctrine does not apply. *W.S. Kirkpatrick*, 493 U.S.. at 407. Defendants provide no reasoning to support the claim

---

[24] Defendants are presumably aware of these factors, given that they cite to the case from which they originate.  *D.Mem*. at 47. That Defendants provide no consideration of the relevant factors is telling.

that adjudication requires the Court to "judge the criminal law, state security law, and telecommunications law" of the PRC. *D.Mem*. at 47. Defendants provide no analysis or reason demonstrating that "foreign relations" would be "disrupted." *Id*. *W.S. Kirkpatrick*, 493 U.S. at 407. The doctrine has "no application" because Defendants identify *no* "foreign sovereign act," the "validity" of which "is at issue." *Id*.

### C.  The International Comity Doctrine Does Not Apply to Plaintiffs' Claims

It is Defendants' burden to show this doctrine applies. *See*, *e.g*., *Cruz v. U.S*., 387 F.Supp.2d 1057, 1071 (N.D. Cal. 2005). Defendants provide no rationale or analysis to show that this case implicates the international comity doctrine, let alone that the doctrine warrants dismissal. Defendants do not meet their burden.[25] Plaintiffs do not seek to substitute foreign law with domestic law. The doctrine is not implicated. *See In Re French*, 440 F.3d 145, 153 (4th Cir. 2006) ("[A]t base comity involves the recognition that there are circumstances in which the application of foreign law may be more appropriate than the application of our own law.") Defendants don't point to a more appropriate forum. *D.Mem*. at 48. Defendants, now espousing Justice Breyers' *Kiobel* opinion, neglect that Justice Breyer and three other Supreme Court Justices would grant jurisdiction in cases involving U.S. defendants. *Kiobel*, 133 S.Ct. 1671 (Breyer, J., concurring). Under foreign relations law, in ATS cases involving U.S. defendants, the comity doctrine *automatically* does not warrant dismissal. *Id*. This court should thus automatically grant jurisdiction in this case because it "substantially and adversely affects an important American national interest" such as "preventing the United States from becoming a safe harbor . . . for a torturer or other common enemy of mankind." *Id*. Defendants point to no conflict with foreign law. Defendants provide no reason the doctrine is implicated, let alone applies. Foreign relations law demonstrates that the doctrine does not apply here.

---

[25] This case does not involve foreign heads of state as defendants, and Defendants' reliance on *Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011) is not useful here.

### D.  Foreign Affairs Preemption Doctrine Does Not Apply to Plaintiffs' Claims

"Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). The Supreme Court has held that absent "an express provision for preemption," federal law preempts state law when either "Congress intends federal law to occupy the field" or "even if Congress has not occupied the field, state law is naturally preempted to the extent it conflicts with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) (internal citations and quotations omitted). Preemption is appropriate where "it is impossible for a private party to comply with both state and federal law." *Id*. Defendants do not offer any argument that the U.S. Congress sought to preempt state tort law here.[26] Defendants provide no reason or analysis demonstrating that federal law has "occupied the field," and cannot demonstrate conflict between any state and federal law. The Commerce Control List does not "occupy the field" as to tort law application. Defendants do not and cannot argue that it is "impossible" to meet international trade requirements without violating state tort law. Defendants provide no rationale why, and cite to no precedent finding, that the application of *common law*, as opposed to a state *statute*, is preempted by trade regulation.[27] Further, Defendants can point to no reason or analysis how or why the application of state tort law could in any way "interfere" with any federal policy. *D.Mem.* at 50. Defendants' argument, barren of any explanation or analysis, is deficient and must fail.

For all the reasons detailed herein, this Court should deny Defendants' Motion to Dismiss.

---

[26] Defendants cannot provide any reason to believe that those engaging in international trade would be "by their very nature . . . free from the hindrance of a possible damage suit." *Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009) (quoting *Johnson v. U.S.*, 170 F.2d 767, 769 (9th Cir.1948)).

[27] Plaintiffs are *not* seeking to enforce a state statute regulating the international trade of technology to the CCP, and the preemption doctrine is simply not applicable here. Even if a state statute were at issue, "state statutes enjoy a presumption of validity in a field which the states have traditionally occupied." *Zimmerman v. Novartis Pharmaceuticals Corp.*, 889 F.Supp.2d 757, 770 (citing *Wyeth v. Levine*, 555 U.S. 555, 565 n. 3 (2009) (quotation omitted).

Respectfully Submitted,

August 8, 2013                                    /S/ Daniel S. Ward_____
                                                 Daniel S. Ward
                                                 Taimur Rabbani
                                                 Ward & Ward, P.L.L.C.
                                                 2020 N Street, NW
                                                 Washington D.C. 20036
                                                 (202) 331-8160
                                                 dan@wardlawdc.com

                                                 Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of August 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send, as appropriate, a notification of such filing to the following:

Lincoln O. Bisbee, Esq.
MORGAN, LEWIS & BOCKIUS
111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
(202) 739-3001 fax
lbisbee@morganlewis.com

Kathleen M. Sullivan
QUINN EMANUAEL URQUHART and SULLIVAN
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7327
kathleensullivan@quinnemanuel.com

Isaac Nesser
QUINN EMANUAEL URQUHART and SULLIVAN
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
isaacnesser@quinnemanuel.com

Faith E. Gay
QUINN EMANUAEL URQUHART and SULLIVAN
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
faithgay@quinnemanuel.com

__/S/ Daniel S. Ward_____
Daniel S. Ward

52