IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DU DAOBIN, et al. | \* |
| | \* |
| Plaintiffs | \* |
| | \* |
| v. | \* Civil No.: **PJM 11-1538** |
| | \* |
| CISCO SYSTEMS, INC., et al. | \* |
| | \* |
| Defendants | \* |

**OPINION**

**I.**

Introduction

Du Daobin ("Du"), Zhou Yuanzhi ("Zhou"), Liu Xianbin ("Liu"), and Does 1-10 have sued Cisco Systems, Inc. ("Cisco") and its Chairman and CEO, John Chambers ("Chambers") pursuant to the Alien Tort Statute 28 U.S.C. § 1350, alleging in addition a number of claims under Maryland and California law.[1]

The case was stayed pending the U.S. Supreme Court's rulings in *Kiobel v. Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) and *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012). Following the Supreme Court's decision in these cases, Plaintiffs filed a First Amended Complaint and Defendants filed a Motion to Dismiss. That Motion, fleshed out by oral argument, is now before the Court for decision.

**II.**

Parties

Plaintiffs are citizens and residents of the People's Republic of China.

---
[1] The state claims include battery, assault, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent entrustment.

Cisco, one of the world's largest technology corporations, is headquartered in San Jose, California, and has offices and locations worldwide, including in the State of Maryland. First Am. Compl. ¶ 26. John Chambers is the Chairman and CEO of Cisco, not otherwise a resident of Maryland.

### III.

Factual Background

According to the First Amended Complaint, Plaintiffs have been and are being persecuted by Chinese Communist Party ("CCP") officials acting under color of law in the People's Republic of China ("China" or "PRC").

The CCP is said to aggressively monitor the Internet and its users through a nationwide surveillance program called the Golden Shield. *Id*. ¶¶ 45-49. The Golden Shield was designed by Cisco. *Id*. ¶ 52. While the Golden Shield is ostensibly employed as a method to enhance the ability of the CCP to combat criminal activity, in reality, say Plaintiffs, it is used to detect, monitor, detain, suppress, and torture dissidents, such as themselves. *Id*. ¶ 47. Each Plaintiff submits that he or she has been unlawfully detained, subjected to forced labor, prosecuted, and tortured for publishing and circulating Internet articles that called for fair treatment of rural farmers (Du) and human rights and democratic reform in China (Zhou, Liu). Du states that he is closely monitored and is restricted to Yingcheng City. *Id*. ¶ 15. Zhou is under house arrest, and Liu is currently serving a ten-year prison term. *Id*. ¶¶ 18, 21, 22

Among other things, Golden Shield is said to block content on the Internet as common as global current events, including the 2011 revolution in Egypt, as well as any content that mentions Liu Xiaobo, the 2010 Nobel Peace Prize laureate. *Id*. ¶¶ 50-51.

Allegedly, at least as early as 2002, Cisco and Chambers assisted in the creation of the Golden Shield, despite knowing that that the technology was being used and would be used to identify and torture dissidents. *Id*. ¶ 75. Specifically, the Golden Shield, based on Cisco technology including Cisco "mirroring routers," was known to Defendants to allow the CCP to monitor information transmitted through Internet gateway routers into and out of China. *Id*. ¶ 54. In fact, Cisco and CEO John Chambers are said to have proposed to CCP officials a system that would link a person's identity, voice patterns, Internet patterns of use and history, political tendencies, family background, and work history to their cell phone, then to make that information instantaneously accessible to CCP officials via a mobile device. *Id*. ¶ 55. Cisco thereafter supposedly designed, created, and/or implemented just such a system. In 2011, Cisco is said to have specifically agreed to provide the CCP with networking equipment that would facilitate city-wide surveillance. *Id*. ¶ 57. To this day, Cisco technology and training purportedly continues to comprise the backbone of the CCP's surveillance systems and capabilities. *Id.* In sum, Plaintiffs allege that Defendants not only knew and know that CCP officials would use and have been using Cisco technology to oppress and jail dissidents; Cisco in fact supposedly "created its technology specifically for the purpose of facilitating the CCP in this campaign of torture" and human rights violations. *Id*. ¶ 78.

Plaintiffs argue that, at all relevant times, in working with the CCP, Cisco acted predominantly in the United States. *Id*. ¶¶ 7, 27, 80, 81.

**IV.**

Kiobel v. Dutch Petroleum Co.

Of the eleven counts asserted by Plaintiffs, the first five are framed as violations of either international or federal law. All, however, are brought pursuant to the Alien Tort Statute, 28

U.S.C. § 1350, which provides in pertinent part that: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

Because the validity of that statute was under review by the Supreme Court while this suit was pending, the parties and this Court deemed it appropriate to await the High Court's decision in this case before going forward. The Supreme Court's decision in *Kiobel*, essentially holding "that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption" *Kiobel v. Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013), obviously does have considerable impact on this case, in ways that will be discussed more particularly as the contentions of the parties are analyzed.

V.

Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). "It requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

A Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). "The

plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id*. at 647 (quoting *Richmond*, 945 F.2d at 768). Although the court "must generally accept as true all factual allegations pled in the complaint . . . [the court] is 'not bound to accept as true legal conclusions couched as factual allegations.'" *Doe v. Sebelius*, 676 F. Supp. 2d 423, 428 (D. Md. 2009) (quoting *Iqbal*, 556 U.S. at 662) *aff'd sub nom. Doe v. Obama*, 631 F.3d 157 (4th Cir. 2011).

A motion to dismiss under Rule 12(b)(6) for failure to state a claim tests the sufficiency of a complaint, but does not resolve factual contests, the merits of a claim, or the applicability of defenses. *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering such a motion, the court ordinarily accepts the complaint's factual allegations and draws any reasonable factual inferences in favor of the plaintiff. *Robertson v. Sea Pines Real Estate Companies, Inc*., 679 F.3d 278, 284 (4th Cir. 2012).

"When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "When, however, . . . a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc*., 334 F.3d 390, 396 (4th Cir. 2003) (citing

*Combs*, 886 F.2d at 676). "In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

## VI.

### Contentions of the Parties

First and foremost, Chambers argues that the Maryland Federal Court lacks personal jurisdiction over him in any and all respects. Plaintiffs, in opposition, say Chambers has a substantial nexus to this state due to his leadership role within Cisco.

Together Defendants cite a number of other reasons why the case is subject to dismissal: nonjusticiability based on the political question and act of state doctrines; corporate immunity under the ATS; failure to state a claim because of the non-applicability of the ATS to extraterritorial transactions; and failure to state a claim because the Complaint does not plausibly allege either the *actus reus* or *mens rea* required for imposing secondary liability.[2]

Plaintiffs respond that Defendants have not met their burden to show that the political question and act of state doctrines apply; that corporations can be held liable under the ATS; that Defendants' U.S.-based conduct is sufficient to constitute actionable ATS claims; and that the First Amended Complaint sufficiently alleges the requisite *mens rea* and *actus reus* elements for ATS claims.

## VII.

### Personal Jurisdiction over Chambers

---

[2] Defendants also urge dismissal of Plaintiffs' state law claims, most prominently suggesting that, should the federal claims go out, the Court should decline to exercise supplemental jurisdiction. Because, as the Court will discuss, the Court will in fact dismiss the federal claims, it will decline to exercise jurisdiction over the state claims and dismiss them without prejudice.

A federal court may assert personal jurisdiction over a non-resident defendant if (1) the long-arm statute of the forum state confers jurisdiction, and (2) the exercise of personal jurisdiction comports with constitutional due process. *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that requiring the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation omitted).

The Court finds that Plaintiffs have failed to make a prima facie showing of personal jurisdiction over Chambers. Personal jurisdiction must be based on Chambers' personal contacts with Maryland, not merely his role as CEO of Cisco. *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 699-700 (D. Md. 2012) *mod. on clarification,* 904 F. Supp. 2d 530 (D. Md. 2012) *aff'd*, 722 F.3d 591 (4th Cir. 2013) (citations omitted) ("Personal jurisdiction over Cardella must be based on [one's] personal contacts with the state of Maryland, not simply his status as AHRN's CEO."). To be sure, Cisco maintains an office and does business in this state. But Plaintiffs' sole assertion that "Chambers, as CEO, maintains a close business connection to this District", First Am. Compl. ¶ 14, is a legal conclusion wholly insufficient to subject Chambers to personal jurisdiction. Accordingly, the Court grants Plaintiffs' Motion to Dismiss as to all claims asserted against Chambers.

## VIII.

### Justiciability

A. Political Question Doctrine

"The political question doctrine had its genesis in the Supreme Court's decision of *Marbury v. Madison*, where Chief Justice Marshall explained that '[q]uestions, in their nature political, of which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 408 (4th Cir. 2011) (quoting 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803)). "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 211 (1962). *Baker* outlined six independent tests for determining whether courts should defer to the political branches on an issue:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. When determining whether a case is justiciable, courts should analyze "the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211-12.

In *Kiobel*, the Supreme Court noted that foreign policy implications "underlying the presumption against extraterritoriality . . . constrain courts exercising their power under the ATS." *Kiobel v. Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013).

> This Court in *Sosa* repeatedly stressed the need for judicial caution in considering which claims could be brought under the ATS, in light of foreign policy concerns. As the Court in *Sosa* repeatedly explained, "the potential [foreign policy] implications . . . of recognizing . . . . causes [under the ATS] should make courts

> particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."

*Id*. (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). Indeed, even before *Kiobel*, a number of courts considering ATS claims had dismissed ATS cases on political question grounds. *See, e.g., Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 984 (9th Cir. 2007); *Joo v. Japan*, 413 F.3d 45, 46 (D.C. Cir. 2005).

Cisco contends that the *Baker* factors support dismissal here. First, Cisco argues, Plaintiffs ask the Court to decide matters "touching foreign relations," *Baker,* 369 U.S. at 211 — an area especially fit for political question dismissal because it poses "the impossibility of deci[ding] without an initial policy determination of a kind clearly for nonjudicial discretion" and "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," *id*. at 217. The Legislative and Executive branches of the Federal Government have enacted U.S. export laws and regulations governing sales to China which are designed to strike a balance between the Nation's policy of economic and political engagement with China and concerns about China's respect for civil and human rights. Cisco thus argues that permitting this litigation to proceed would create "the potentiality of embarrassment from multifarious pronouncements by various departments on one question", *id*., and that in any event, there are no "judicially discoverable and manageable standards for resolving" the issues in dispute, *id*.

The Court agrees that the political branches of the U.S. Government have developed a complex set of rules and regulations around what products may be exported to China. Following the 1989 military assault on demonstrators by the People's Republic of China ("PRC") in Tiananmen Square, the U.S. Government imposed constraints on the export to China of certain items on the Commerce Control List (CCL). Pursuant to Sections 902(a)(4), 902(b) of the

Foreign Relations Authorization Act for fiscal year 1990-1991, Public Law 101-246 (February 16, 1990), better known as the U.S. Tiananmen Square Sanctions, all specified "crime control or detection instruments or equipment" were banned from export to China in the absence of an express report by the President to Congress stating that the PRC "has made progress on a program of political reform throughout the country" or "that it is in the national interest of the United States".  The Act emphasized that "it is essential that the United States speaks in a bipartisan and unified voice in response to the events in the People's Republic of China, and that the President be given the necessary flexibility to respond to rapidly changing situations so that the long-term interests of the United States are not damaged".  §902(b)(3).

Very much on point is the fact that Congress and the Commerce Department expressly permit sales to Chinese police agencies of Internet infrastructure components such as the technology at issue here.  The Export Administration Regulations (EAR), 15 C.F.R. §§ 730-774, impose license requirements for certain exports from the United States for, among other reasons, "crime control".  15 C.F.R. § 742.7(a).  For example, the EAR restrict the export of specially designed implements of torture and equipment designed for the execution of humans.  *See generally* 15 C.F.R. § 774, Supp. No. 1 (The Commerce Control List).  A license is required for the export of certain "[c]rime control and detection instruments and equipment and related technology and software".  15 C.F.R. § 742.7(a).  This ban on software and technology is tightly cabined; the General Software Note provides for the restriction of the export of technology only if it is "'required' for the 'development', 'production', or 'use' of a controlled product", unless it meets the requirements of certain software related to "information security" such as encryption software.  69 Fed. Reg. 46087, July 30, 2004, *as amended at* 78 Fed. Reg. 37394 (June 20, 2013) (codified at 15 C.F.R. § 774, Supp No. 2); 15 U.S.C. § 774, Category 5, Part 2.  "Publicly

available software" (other than published encryption software) is not subject to the EAR. 15 U.S.C. §§ 734.3(b)(3), 734.7. *See also* Revisions to the Commerce Control List to Update and Clarify Crime Control License Requirements, 75 Fed. Reg. 41078, 41078 (July 15, 2010) (reserving for a later rule "the degree to which software and technology related to commodities on the Commerce Control List should be listed and how such software and technology should be described").

In view of the foregoing, the Court finds the political question doctrine is necessarily implicated by Plaintiffs' claims, and as such, deprives the Court of jurisdiction to adjudicate the merits of the ATS claims. The Legislative and Executive branches of the Federal Government have emphasized the "essential" need to "speak[] in a bipartisan and unified voice", § 902(b)(3), in the context of PRC actions against its citizens and residents in particular. "In maintaining its controls on crime control and detection items, the United States considers international norms regarding human rights and the practices of other countries that control exports to promote the observance of human rights." 15 U.S.C. § 742.7(d). U.S. trade regulations have yet to prohibit exportation of the Cisco technology at issue in this case.

In any event, the technology Cisco has allegedly customized and sold to China to assist them with these purported human rights violations is inherently neutral technology that can clearly be used in a variety of non-offensive ways. This suit asks the Court to decide the extent to which apparently neutral technology can be used in other ways by foreign governments. The Court declines to do so. This issue should not be the subject of individual lawsuits. To adjudicate this question would require the Judiciary to determine whether the U.S. rules and regulations surrounding the export of products to China are sound. Such adjudication would necessarily implicate at least the fourth, fifth and sixth *Baker* factors: It would demonstrate a lack

of respect for both the Executive and Legislative branches which have developed a finely balanced approach to foreign relations and human rights, would question a political decision already clearly made, and would introduce the possibility of additional voices where only a single voice should be heard.

B. Act of State Doctrine

The act of state doctrine is premised on the principle that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, (1964) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)). The doctrine is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs". *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Sabbatino*, 376 U.S. at 423). "The doctrine's purpose is to prevent judicial pronouncements that would disrupt this country's foreign relations." *Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 171 (E.D. Va. 1993) *aff'd*, 32 F.3d 77 (4th Cir. 1994) (*citing Sabbatino*, 376 U.S. at 428).

Under the doctrine, a legal action may be barred if "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc*. 493 U.S. at 405. The Supreme Court has cautioned that the doctrine "does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be

deemed valid." *Id*. at 409. To determine whether the doctrine applies, *Sabbatino* articulated three factors: (1) the degree of consensus regarding a certain area of international law, (2) the extent to which the issue "touch[es] . . . sharply on national nerves,' and (3) whether the government that perpetrated the actions is no longer in existence. 376 U.S. at 428.

The Court finds that the act of state doctrine is yet another reason why this lawsuit must not go forward. Plaintiffs are effectively asking the Court to decide that the Chinese government, with substantial assistance from Cisco, has engaged in multiple violations of international law, namely, crimes against humanity, torture, cruel, inhuman, or other degrading treatment, arbitrary arrest and prolonged detention, forced labor, and other human rights violations. Adjudication of these claims would require judging official actions of the Chinese government and its officials in enforcing Chinese law against Chinese citizens in China. There cannot be the slightest doubt that Plaintiffs' allegations of violations "of international law touch . . . sharply on national nerves", which carry "important . . . implications . . . for our foreign relations" with China. *Id*. Nor can it be doubted that litigating such issues would raise serious concerns of "the danger of unwarranted judicial interference in the conduct of foreign policy", which the Supreme Court cautioned against in *Kiobel*. 133 S. Ct. at 1664-65.

**IX.**

Corporate Immunity Under the ATS

Cisco next argues that the ATS "does not provide subject matter jurisdiction over corporations," citing *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 149 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013). Although the Supreme Court initially granted certiorari on this issue, it ultimately affirmed *Kiobel* on alternate grounds. Cisco thus contends that the Supreme Court did not disturb the Second Circuit's reasoning as to ATS liability of a

corporation, while Plaintiffs maintain that *Kiobel* necessarily found that jurisdiction over corporations obtained. Plf. Mem. at 26. For the present, this Court takes a middle ground.

What is clear is that the Supreme Court's holding in *Kiobel* does not plainly address whether corporations are immune under the ATS. And while the Fourth Circuit has yet to address the issue, several Circuits have held that corporations can indeed be liable under the ATS. *See Doe v. Exxon Mobile Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated*, No. 09-7125, 2013 WL 39701013 at *1 (D.C. Cir. July 26, 2013) (vacating judgment "in light of intervening changes in governing law regarding the extraterritorial reach of the [ATS]" and aiding and abetting liability standard); *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 761 (9th Cir. 2011) (en banc), *cert. granted and judgment vacated*, 133 S. Ct. 1996 (2013) (vacating on the basis of *Kiobel*), *dismissed on remand*, 722 F.3d 1109 (affirming the district court's judgment of dismissal with prejudice); *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1021 (7th Cir. 2011); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999).

Although, candidly, this Court harbors doubt that corporations are immune under the ATS, given that the case is dismissible on other grounds, the Court refrains from addressing the issue at this time.

**X.**

Presumption Against Extraterritoriality

Cisco also argues that the ATS flatly cannot be applied extraterritorially.

The Supreme Court did hold in *Kiobel* "that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Kiobel*, 133 S. Ct. at 1669. *Kiobel* involved ATS claims asserted by Nigerian nationals who filed

suit in a U.S. federal court against Dutch, British, and Nigerian corporations for violations of the law of nations allegedly occurring in Nigeria. *Id*. at 1662-63. The Supreme Court found petitioners' case was barred for lack of a "clear indication of extraterritoriality." *Id*. at 1669 (quoting *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2883 (2010)). "On these facts," said the Court, "all the relevant conduct took place outside the United States." *Id*. The Court held that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application" and that "it would reach too far to say that mere corporate presence suffices." *Id*.

Justice Kennedy, however, wrote separately to note that the Court was properly leaving "open a number of significant questions regarding the reach and interpretation" of the ATS. *Id*. Moreover, Justice Alito, in a concurrence joined by Justice Thomas, stated that an ATS cause of action will be barred "unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations." *Id*. at 1670.

It is not yet clear when and under what circumstances ATS claims will "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id*. at 1669. Following *Kiobel,* some courts have dismissed ATS claims for alleging purely extraterritorial conduct. *See Balintulo v. Daimler AG*, 727 F.3d 174 (2d. Cir. 2013) (dismissing ATS claims brought against South African subsidiary companies for aiding and abetting violations of international law committed by the South African government); *Chen Gang v. Zhao Zhizhen*, No. 3:04-CV-1146-RNC, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) (dismissing ATS action as a "paradigmatic 'foreigncubed' case" where the parties were present in China and the alleged violations of international law all took place in

China) (collecting cases); *Al Shimari v. CACI Intern., Inc.* No. 08-cv-827(GBL), 2013 WL 3229720 at *1 (E.D. Va. June 25, 2013) (dismissing ATS claims where "the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign"). By way of contrast, compare *Sexual Minorities Uganda v. Lively*, No. 12–CV–30051–MAP, 2013 WL 4130756, at *2 (D. Mass. Aug. 14, 2013) (finding that the *Kiobel* restrictions on extraterritorial application of the ATS did not apply where "where Defendant is a citizen of the United States and where his offensive conduct is alleged to have occurred, in substantial part, within this country.").

The present case may well be distinguishable from *Kiobel*. First, Cisco is an American company with offices throughout the United States, including in this state. Second, Plaintiffs allege that Cisco's developmental actions relevant to the Golden Shield took place predominantly, if not entirely, within the United States. Arguably, *Kiobel* notwithstanding, ATS claims could be brought against a defendant which has taken certain actions within the United States with respect to products that might be primarily used for violations of the laws of nations. *See Sexual Minorities Uganda*, 2013 WL 4130756 at *2 ("An exercise of jurisdiction under the ATS over claims against an American citizen who has allegedly violated the law of nations in large part through actions committed within this country fits comfortably within the limits described in *Kiobel*."). But, once again, the Court need not wade into this debate. It will assume, without deciding, that the presumption of extraterritoriality does not bar the case at hand following *Kiobel*.

## XI.

### *Actus Reus* and *Mens Rea* Requirement

Cisco also maintains that Plaintiffs' ATS claims fail to plausibly allege requisite *mens rea* and *actus reus* elements.

The First Amended Complaint asserts three theories of secondary liability: "knowing[ly] and purposeful[ly] aid[ing] and abet[ing]"; "conspiracy"; and "joint criminal enterprise". First Am. Compl. ¶¶ 186, 197-98, 210, 222, 233.

In *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011), the Fourth Circuit held "that the ATS imposes liability for aiding and abetting violations of international law, but only if the attendant conduct is purposeful." *Aziz*, 658 F.3d at 390. The *Aziz* Court "adopt[ed] . . . as the law of this circuit" the Second Circuit's analysis in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009).

> The Second Circuit held that "a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime."

*Aziz*, 658 F.3d at 396 (quoting *Talisman*, 582 F.3d at 258). *Talisman* had further held that "under a theory of relief based on a joint criminal enterprise, plaintiffs' conspiracy claims would require the same proof of *mens rea* as their claims for aiding and abetting." 582 F.3d at 260. Although Plaintiffs here contend that the Court should look to the Rome Statute[3] and not *Talisman* and apply a lesser *mens rea* standard of knowledge to their conspiracy and joint criminal enterprise claims, Def. Opp. 22-25, in light of *Aziz*, which adopted *Talisman* "as the law of this circuit" *Aziz*, 658 F.3d at 398, the Court is simply not at liberty to do so.

Applying the *Aziz* standard, the Court finds Plaintiffs have failed to plausibly allege that Cisco's actions had "a substantial effect on the perpetration of" CCP's alleged international law violations. No facts pled in the First Amended Complaint connect Cisco's legitimate business

---

[3] The Rome Statute of the International Criminal Court, art. 30, July 17, 1998, 2187 U.N.T.S. 90, provides for criminal liability where "the material elements [of the crime] are committed with intent and knowledge." *Id*. "[A] person has intent where . . . that person means to engage in the conduct . . . [or] . . . means to cause that consequence or is aware that it will occur in the ordinary course of events." *Id*. A defendant has knowledge if he or she has an "awareness that a circumstance exists or a consequence will occur in the ordinary course of events." *Id*.

~ 17 ~

actions to the Golden Shield thence to CCP's alleged detention, persecution, and torture of Plaintiffs. Notably, Plaintiffs concede that they were well-known political activists prior to the use of the Golden Shield by the CCP. First Am. Compl. ¶¶ 116, 129, 150. Liu was arrested and kept under surveillance by the CCP in the 1990s, well prior to development and use of the Golden Shield. *Id*. ¶¶ 150-153. The only suggestion that Cisco technology had "a substantial effect on the perpetration of the crime," *Aziz*, 658 F.3d at 398, is that "the local police finally lost their patience when they found evidence, using CISCO technology, in Zhou's email that he was writing a report" that was saved "in the draft folder of his Google email account," First Am. Compl. ¶¶ 135-136. Plaintiffs, however, concede that the police then searched his home and confiscated his computer, *id.* ¶137, and furthermore concede that he had been publishing articles critical of the CCP "[s]ince the beginning of the 21st century" and as a result had been under close surveillance, including meeting with police in person, *id*. ¶¶ 129-134.

Nor does the First Amended Complaint allege sufficient facts to show that Cisco acted with the requisite purpose to facilitate violations of international law committed by CCP officials. The Fourth Circuit in *Aziz* held that ATS claims failed to meet the "purpose" and "substantial assistance" standard where plaintiffs had made a "cursory allegation" that the defendant placed chemicals used in the manufacture of chemical weapons "into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq." *Aziz*, 658 F.3d at 401. Here, similarly, Daobin at most alleges that Cisco acted with knowledge that CCP officials might use its technology to perpetrate the injuries against Plaintiffs. Out of a 90 page presentation, Plaintiffs rely on a single bullet point quotation from a "speech" delivered by a Chinese "government official" which purportedly reflects the

~ 18 ~

"Government goals" of combatting Internet crime, including "Combat 'Falun Gong' evil religion and other hostilities". First Am. Compl. ¶ 98.

From all that appears, Cisco technology remains a neutral product that can be used in innumerable non-controversial ways. Although Plaintiffs allege that this technology was somehow customized for CCP officials for use in nefarious ways, *id*. ¶¶ 62-63, they simply have failed to indicate with any logic what it means to customize technology that would permit the sort of human rights violations alleged here, such as torture. *Aziz* and *Talisman* require Plaintiffs to *plausibly* allege that Cisco created the Golden Shield technology with the "purpose of facilitating the commission of [CCP's] crime[s]", and, furthermore, that Cisco provided "practical assistance to [CCP officials] which ha[d] a substantial effect on the perpetration of the crime[s]". *Aziz*, 658 F.3d at 396 (quoting *Talisman*, 582 F.3d at 258). In the final analysis, Plaintiffs have not done so.

## XII.

### State Law Claims

Because all of Plaintiffs' federal law claims are being dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, and those claims will be dismissed for lack of federal jurisdiction. *See* 28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial . . . the state claims should be dismissed as well").

## XIII.

### Conclusion

Having concluded that the Court lacks personal jurisdiction over Chambers, that the remaining federal claims against Cisco are nonjusticiable and fail to plausibly allege the requisite *mens rea* and *actus reus* elements with respect to any possible secondary liability, Cisco's Motion to Dismiss will be **GRANTED WITH PREJUDICE** as to all of Plaintiffs' federal claims. Since the Court declines to exercise jurisdiction over the state law claims, the Motion to Dismiss as to all of Plaintiffs' state claims will be **GRANTED WITHOUT PREJUDICE**.

A separate Order will **ISSUE.**

　　　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　**PETER J. MESSITTE**
　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

**February 24, 2014**